**MLC, INC., Plaintiff,**

v.

**NORTH AMERICAN PHILIPS CORPORATION, INC., and Philips Business Systems, Inc., Defendants.**

**No. 78 Civ. 6080 (SWK).**

United States District Court,
S.D. New York.

Sept. 8, 1987.

Murphy and O'Connell, by Patrick Murphy, Kathleen O'Connell, New York City, for plaintiff.

Townley and Updike, James P. O'Neill, John T. Morin, Christopher W. Cummings, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This case was tried to the Court pursuant to Rule 52(a) of the Federal Rules of

Civil Procedure. The following are the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

#### I. BACKGROUND

This is an unusual case. At its heart is a struggle about the distribution of an information storage technology, known as a magnetic ledger card ("mlc"), that was obsolete even as the dispute was developing. John Fitzsimmons, president of defendant, Philips Business Systems, Inc. ("PBSI"), transferred the distribution of mlc's—a critically important part of PBSI's business—to his boyhood friend, Thomas Donaghy, for no consideration. Finally, Donaghy sold his business, plaintiff MLC, Inc. ("MLC"), back to PBSI for a profit at a time when MLC's future viability was doubtful.

MLC's second amended complaint contains seven counts, all alleging antitrust violations. In an opinion dated May 3, 1983, Judge Goettel granted defendants' motion for summary judgment on Counts 3, 4, and 6. The plaintiff has withdrawn Count 5. Only Counts 1, 2 and 7 remain. Count 1 alleges that, in violation of Section 1 of the Sherman Act, the defendants conspired to restrain trade in mlc's by forcing MLC, Inc. out of business. Count 2 alleges that the terms of the conspiracy were that the two manufacturersa of mlc's, Magnetdruck ("MD") and Jollenback and Kasten ("J & K") would refuse to sell mlc's to plaintiff, PBSI would cause their branch offices to refuse to purchase mlc's from MLC, and J & K, and PBSI would fix mlc prices. Count 8 alleges a violation of the Wilson Tariff Act in that defendants attempted to restrain trade in imported goods, namely mlc's. Plaintiff seeks $3 million in damages trebled to $9 million.

Besides a general denial of wrongdoing, defendants assert three primary defenses: plaintiff has at best asserted claims for business torts; plaintiff lacks standing to sue; and certain blanket supply agreements permitted PBSI to terminate MLC's distributorship and replace MLC with itself.

#### II. THE FORMATION OF MLC, INC.

The mlc's at issue in this case were manufactured to store information solely in the Philips P350 line of computers (the "P350"). The P350 was manufactured by N.V. Philips Gloeilampfabricken ("N.V. Philips") and introduced in the United States in 1969 through its subsidiaries, defendants North American Philips ("NAPC") and PBSI. The sole suppliers and manufacturers of mlc's for use in Philips business machines ("Philips mlc's") were the two West German manufacturers, J & K and MD. A reliable supply of mlc's was critically important to PBSI's success in selling P350's as the P350 could not work without them. The general managers of these two companies were Dieter Ockenfels and Herbert Sievers, respectively.

When PBSI first started importing and distributing the P350 computer into the United States in 1969, it imported mlc's to sell to its P350 customers. Soon after John Fitzsimmons became president of PBSI's Data Systems Division, he decided PBSI could not efficiently sell mlc's, and attempted to reach an agreement with a separate company to import and distribute Philips mlc's. Although Fitzsimmons made a half-hearted search of established business forms companies, he wanted to establish a relationship with a small company over which he could exert control.

With this in mind, Fitzsimmons turned, in early 1972, to his boyhood friend, Thomas Donaghy, who was then working for a consulting company, and proposed that Donaghy become the distributor of Philips mlc's. Although Donaghy had experience with business computers and forms, he had never been a distributor or importer. Fitzsimmons convinced Donaghy to enter the mlc importing business, Donaghy left his job, and reached an agreement with Fitzsimmons to distribute Philips mlc's in the United States.

On April 19, 1972, Fitzsimmons wrote a letter to Donaghy which summarized the terms of the agreement between Donaghy and PBSI regarding the importation and distribution of Philips mlc's. The agreement reads as follows:

 A.) MLC, Inc. is to be the sole supplier and distribution point of magnetic ledger cards for the P–350 Office Computer in the U.S.A.

 B.) MLC, Inc. must maintain adequate inventory on all sizes of magnetic ledger cards to insure fast delivery of these cards to our customers.

 C.) MLC, Inc. must maintain the quality and price of these cards in line with the present policies.

 D.) MLC, Inc. must purchase cards only from our authorized manufacturers of magnetic ledger cards.

The letter also contained the following paragraph:

 Our [PBSI']s Service Department will keep you [MLC] informed of the approved manufacturers' names, and will also guard against any unauthorized or unapproved cards sold by third parties.

Thus, according to the agreement, PBSI transferred its mlc distribution business to MLC for no consideration, and MLC was to be the exclusive distributor of mlc's for Philips computers. The agreement contemplated a close working relationship between PBSI and MLC, as MLC would adhere to PBSI's price and quality standards and PBSI would attempt to enforce MLC's exclusive distributorship.

## III. THE RELATIONSHIP BETWEEN PBSI AND MLC

MLC was incorporated as an independent corporation in 1972. Nevertheless, it relied heavily on PBSI for assistance in all facets of its business. For example, Donaghy often used PBSI's telex machine, as it did not have one of its own. Donaghy often also worked with PBSI salesmen to develop customers. Finally, MLC used PBSI's assistance in testing malfunctioning mlc's. The relationship was so close, in fact, that Donaghy himself once described MLC as a

*de facto* employee of PBSI. Furthermore, MLC reported its sales figures to PBSI and cleared all proposed price increases with PBSI.

### A. *PBSI's Assistance to MLC*

#### 1. *Relations with the manufacturers*

Fitzsimmons immediately acted to assist MLC. On the same day he sent the letter to Donaghy, he sent a telex to Dieter Ockenfels at J & K announcing the agreement with Donaghy. The telex reads, in part:

 We would like to inform you that we have set up a new distributor for magnetic ledger cards in U.S.A..... The new distributor will work only with you and will honor all of our commitments regarding delivery of cards and price with you.... The company is reputable and we expect a good relationship between your company and his company.... The company name is MLC Incorporated....

(Def. Exh. IIIII). In the same telex, Fitzsimmons ordered approximately 110,000 mlc's on MLC's behalf. J & K acknowledged Fitzsimmons' telex with a letter dated April 24, 1972, which states in part:

 We kindly acknowledge receipt of your telex dated April 19, from which we have learned that you have set up Messrs. MLC Incorporated, New York, as new distributor of you for magnetic ledger cards in U.S.A. We can assure you that we shall endeavor to assist this company in every respect....

(Def. Exh. JJJJJ). The letter also confirmed the order for mlc's and stated that Ockenfels hoped to meet with Fitzsimmons and Donaghy in May. Through Fitzsimmons' introduction, Donaghy and Ockenfels did eventually meet.

Fitzsimmons continued to facilitate MLC's relationship with J & K until he left PBSI in February, 1973. For example, on May 10, 1972, Fitzsimmons ordered 20,000 mlc's from J & K for MLC, Inc. (Def. Exh. FFFFFF). On February 12, 1973, just prior to Fitzsimmons' exodus from PBSI, Fitzsimmons sent a letter to Ockenfels which reads as follows:

As you requested, this letter will conirm that MLC, Inc. is our authorized distributor for Magnetic Ledger Cards.

We are presently satisfied with the good quality of the Magnetic Ledger Cards we have been receiving and thank you for your help in this regard.

(Def. Exh. IIIIII).

MLC had problems in dealing with both German manufacturers. It had a dispute about the quality of the first order of cards it obtained from MD. Donaghy asked PBSI to mediate this dispute. It could not be resolved, and thereafter MLC ordered no cards from MD. MLC also had a dispute with J & K about the terms of payment for the mlc's and J & K threatened to cut off supplies. Only PBSI's intervention prevented this.

### 2. Enforcing MLC's Exclusive Distributorship

Pursuant to its agreement with MLC, PBSI also continued to assist MLC by insuring that MLC would be the exclusive distributor of mlc's for Philips business computers. In a policy statement effective April 15, 1972 that PBSI sent to its various branch managers, PBSI stated that the only approved mlc's were those purchased "from our present distributor—MLC, Inc....." (Pl. Exh. 1). The statement warned that failure to purchase mlc's from MLC would result in cancellation of the warranty on P350 computers. On May 16, 1972, PBSI sent a memorandum to all P350 authorized agents in the United States stating that, in the future, all mlc's must be ordered from MLC. (Joint Pre–Trial Order, Statement of Undisputed Facts, ¶ 16). On April 6, 1973, Tom Dickson, PBSI's service manager, sent a memo to all PBSI agents and branches stating that unauthorized dealers had been selling mlc's to Philips customers and reminding them that the only way to assure reliable service was to purchase cards from PBSI's authorized distributor, MLC, Inc. (Undisputed Facts, ¶¶ 20–22; Pl. Exh. 7).

### B. Absence of Competition Between PBSI and MLC for the Sale of mlc's

MLC contends that PBSI was competing with it for the sale of mlc's in the United States by selling mlc's to two large accounts, Allied Stores and Irving Trust. The evidence indicates that not only did PBSI not compete with MLC, but it assisted MLC in developing a special size mlc for the Allied account.

### 1. The Allied Stores Account

Fitzsimmons testified that after he left PBSI in 1973 the PBSI salesman handling the Allied Stores account told him that PBSI was selling mlc's to Allied. He did not remember when he was told or the name of the salesman who told him. Donaghy testified that a PBSI salesman also told him in the early part of 1973 that PBSI was selling mlc's to Allied Stores. He testified that he confronted Dickson with this alleged breach of MLC's exclusive distributorship, Dickson admitted he was wrong, and ceased selling the cards. Dickson denied this. Finally, Raymond Fortier, a PBSI service technician, testified that the PBSI salesman assigned to the Allied Stores account told him that PBSI supplied mlc's to Allied. Fortier testified that he learned this prior to his departure from PBSI in February 1973.

This testimony is not persuasive. The witnesses could not remember the details such as the times and places of the conversations. Fitzsimmons' testimony that PBSI did not sell mlc's to Allied before February 1973 contradicts Fortier's testimony that PBSI did. Dickson, Fortier and Fitzsimmons were not involved in the alleged sale of the mlc's, and all learned of it second hand. Finally, none of this testimony was supported with a single document, such as an invoice, receipt, or letter, which demonstrated that PBSI was selling mlc's to Allied. In fact, evidence introduced by PBSI demonstrates otherwise.

On August 10, 1973, Allied ordered 20 P–355 computers from PBSI (Def. Exh. YYYYYYY). PBSI's invoices indicate that

these sales were completed late in 1973 or in early 1974 (Def. Exh. SSSSSSSS). This is the only evidence of a sale of P350's to Allied, and there is no evidence that Allied purchased any mlc's prior to this.

One of the key aspects of the sale to Allied was that Allied needed a non-standard size mlc, 8″ x 6″. PBSI worked with the German manufacturers to create this size card. The evidence indicates that MLC received the benefit of PBSI's creativity.

On August 7, Joe Rita, a PBSI executive, sent, on behalf of Donaghy, a telex to Dieter Ockenfels of J & K requesting a price quote on an 8″ x 6″ mlc (Def. Exh. YYYYYY). Dickson sent a similar telex to J & K on August 16, 1973 (Pl. Exh. 14). Dickson ordered 100,000 mlc's on August 21, 1973 (Pl. Exh. 15) and they were sent to PBSI (Def. Exh. ZZZZZZ). However, as Donaghy testified, the notation, "Received 9/10/73" on the invoice was in his handwriting, and he received the cards for MLC. On August 29, 1973, Dickson ordered 100,000 more mlc's (Pl. Exh. 16). These mlc's were sent to MLC on September 7, 1973 (Def. Exh. AAAAAAA). Donaghy sold these 200,000 cards to Allied on November 20, 1973 (Def. Exh. PPPPPPPP).

The above is the only evidence of mlc purchases by Allied. It clearly indicates that Allied purchased its mlc's from MLC. The evidence also shows that Allied did not begin to purchase mlc's until August 1973, that PBSI did not sell mlc's to Allied, and that PBSI assisted MLC in obtaining the Allied account, by developing a non-standard card and placing orders for it on MLC's behalf.

### 2. *The Irving Trust Account*

Plaintiff also attempted to prove that PBSI sold mlc's to Irving Trust while MLC was in business. John Fitzsimmons testified that he was aware that PBSI was selling mlc's to Irving Trust while PBSI was in business. He did not testify as to who told him or when PBSI was selling the mlc's. The testimony is vague and unsupported and the Court gives it no weight. Fizsimmons also testified that PBSI did not sell mlc's to anybody until February, 1973 when he left PBSI.

Fortier testified, in contrast, that he learned that PBSI was selling mlc's to Irving Trust before November 1972. Fortier serviced Irving Trust's P350s, but he was not responsible for ordering mlc's or delivering them, and his testimony is doubtful.

Donaghy testified that he learned sometime in 1973 or 1974, from a person whose name he could not recall, that PBSI was selling mlc's to Irving Trust and did not remember whether he confronted Dickson with the information. Donaghy's testimony is also vague and undocumented and the Court gives it no weight.

Thomas Dickson of PBSI testified that PBSI did not sell mlc's to anybody while MLC was in business, and that PBSI did not even have any mlc inventory. In light of all the evidence, plaintiff has failed to prove that PBSI was competing with it for the sale of mlc's.

## IV. PBSI ENTERS THE MLC MARKET

### A. *PBSI's Desire to Sell Mlc's*

After John Fitzsimmons left PBSI in 1973, his replacement, Frank Buckley, decided he wanted PBSI to resume selling mlc's because he thought it could be a profitable business and he felt PBSI was taking too great a risk by leaving the distribution of the critically important mlc's in the hands of one small company. This risk, he felt, was exacerbated by the problems Donaghy was having with MD and J & K, and the fear that MLC would be cut off from its suppliers. Buckley also felt that MLC was only a middleman and added unnecessarily to the price of the mlc's.

### B. *PBSI's Initial Plan to Enter the mlc Market: Exclusion of MLC, Inc.*

In late 1973 and without Donaghy's knowledge, PBSI began to plan to enter the mlc market. PBSI's initial plan was that it would replace MLC as the exclusive distributor of mlc's for the P350.

It is clear from the evidence that PBSI enlisted the aid of J & K and MD in doing

so. On April 11, 1974, Ockenfels sent a telex to Dickson which stated, "As circumstances of surrendering are not yet clear...." (Plaint. Exh. 24). It is clear from the context of the letter that Ockenfels was referring to the surrendering of MLC's business to PBSI. A letter dated May 7, 1974 from MD to Buckley indicates that Buckley had recently met with Sievers in Germany. One section of the letter reads:

Mr. Sievers will meet in the week of 20th–25th May 1974 Mr. Dickson of Philips, New York at Eindhoven. On this occasion a new solution for the delivery of magnetic ledger cards by us should be found.

For you it is clear that the wind-up via Messrs. MLC, Inc. (Mr. Tom Donaghy) is very expensive.

(Plaint. Exh. 32)

In May, 1974, Dickson travelled to Germany and met separately with J & K and MD to discuss PBSI's plan to sell mlc's. Dickson informed both of them separately that MLC's business was to be surrendered to PBSI and that PBSI planned to import mlc's for its branches directly from J & K and MD (Pl. Exhs. 33, 38; Undisputed Facts, ¶¶ 54, 58, 91). Dickson asked MD and J & K each to grant PBSI an exclusive distributorship, and in return promised that PBSI would split its mlc orders between MD and J & K. A letter Sievers wrote to Dickson on September 5, 1974, confirms this: "If we understood you quite well at that time, Mr. Donaghy shall be excluded from the delivery of Philips magnetic ledger cards." (Pl. Exh. 58).

There is no evidence that PBSI, MD, and J & K agreed to fix prices. PBSI requested price quotes from MD and J & K and agreed with each separately on mlc prices. The evidence does indicate that MD and J & K knew they were competing with each other for PBSI's business, possibly knew the price each was charging, and set similar prices. Nevertheless, the evidence indicates clearly that MD and J & K were competitors, and the price of mlc's was one facet of their competition.

C. *PBSI's Actual Plan: Competing with MLC, Inc.*

NAPC's legal department was consulted about PBSI's plan and did not approve, fearing antitrust consequences (Pl. Exh. 48). NAPC counsel Ralph Stultz proposed an alternative plan under which PBSI would not replace MLC. Rather, PBSI would purchase mlc's directly from the German suppliers, require its branches to buy their mlc's from PBSI, sell mlc's to its P350 customers and not mention that MLC was another source unless asked about alternative sources, and inform sales agents that they could purchase mlc's from PBSI or MLC. In short, PBSI would enter the mlc business as a competitor of MLC.

PBSI agreed to adopt the proposals. Donaghy was informed in a letter from Stultz dated September 20, 1974 (Plaint. Exh. 64). The body of the letter is reprinted in full:

Please be advised that effective November 1, 1974, Philips Business Systems, Inc. will not place any further orders with you for the supply to it and its branch operations of magnetic ledger cards for use with its computers. Until such time, we will continue to place orders with you as we have done in the past in accordance with our needs.

Our decision to purchase magnetic ledger cards directly from the manufacturer was made after consideration of the need to have a better control over the supply of cards to our branch operations. We would presume that you would continue to supply cards to our sales agents and we would like to know that should we run short of cards for our branches, that we might place orders with you.

Should you have any surplus inventories on hand as of November 1st, we would be pleased to discuss with you the possibility of taking some of this inventory off your hands at an agreed-upon price.

In September 1974, J & K and MD, apparently unaware of PBSI's new plan, each asked PBSI separately how to deal with MLC. Dickson asked Stultz to respond. (Pl. Exhs. 60, 67). Stultz prepared the following responses (Plaint. Exhs. 65, 68).

The letters read:

> In response to your letter to me of August 22, 1974, please be advised as follows. We have advised MLC, Inc. that beginning November 1, 1974, PBSI will no longer purchase magnetic ledger cards (mlc's) from them. PBSI will arrange for the purchase of mlc's directly from its European suppliers.
>
> Our decision not to purchase mlc's from MLC, Inc. only affects the use of mlc's by our branch operations. We understand that MLC, Inc. is still in the business of distributing mlc's and we presume they will continue to sell to PBSI sales agents, customers, and local printers.
>
> You should understand that PBSI has no control over MLC, Inc. nor does it wish to injure MLC, Inc. in its business of distributing mlc's to persons other than PBSI and its branch operations. We would urge that you continue doing business with MLC, Inc. in an ordinary business manner, since we feel it is of some benefit to have two sources of mlc's that our customers could purchase from in the United States.

The letter to MD adds the following paragraph:

> In view of the above, my specific response to your letter of September 5, 1974 is that we have no comment as to the business wishes of Mr. Donaghy insofar as his dealings with you are concerned. Further, we have no advice to give you as to how you should conduct your relationship with Mr. Donaghy, except as indicated in the immediate preceding paragraph.

PBSI's actual plan for entering the mlc market was thus different from the initial plan. It entered the market as a competitor of MLC, ceased purchasing mlc's from MLC for its branch operations, and offered mlc's to its sales agents and other customers. PBSI also did not ask MD or J & K to stop doing business with MLC, but left the decision as to how to deal with MLC up to them.

### D. *The Blanket Supply Agreements*

In 1972, Philips entered into virtually identical agreements with MD and J & K (Def. Exhs. XXXX, TTTTTTT). These agreements (the "blanket supply agreements") grant J & K and MD the exclusive right to manufacture mlc's approved for use in Philips machines. In return, each manufacturer agreed to sell the mlc's only to distributors designated by N.V. Phillips. The manufacturers also agreed to manufacture mlc's in conformity with specifications provided by N.V. Philips and developed by its engineers. The agreements state that the specifications were the property of N.V. Philips and that the manufacturer must keep them confidential. The specifications were quite complex, and could not be reproduced simply by observing, measuring, and studying an mlc.

Although some PBSI employees gave the specifications to potential manufacturers without obtaining confidentiality agreements, these were isolated incidents. The signatories to the blanket supply agreements treated them as confidential, as did other Philips executives and engineers.

None of the relevant parties except the German manufacturers were aware of the blanket supply agreements when MLC was created, when PBSI, J & K, and MD negotiated to replace MLC, or when MLC was sold. Thus, while PBSI had the power to terminate MLC's distributorship pursuant to the blanket supply agreements, it did not invoke them.

### E. *The Sale of MLC*

Once it became clear to Donaghy that PBSI would enter the MLC market, he decided MLC's future was bleak. He entered into negotiations with PBSI to obtain a favorable conclusion of MLC's business. On July 25, 1974, Donaghy's counsel, Thomas Murphy, sent a proposal to counsel for NAPC (Def. Exh. LL). He proposed that MLC and PBSI should enter into a new formal contract under which PBSI could terminate MLC by giving written notice; the termination becoming effective

one year from the date of notice. Murphy also asked that on execution of the agreement MLC be paid $50,000 and that PBSI purchase MLC's inventory at the regular selling price and MLC's receivables at face value.

The parties negotiated an agreement very similar to Murphy's initial proposal (Def. Exhs. YY and XX), and signed two agreements in late 1974 (Def. Exh. BBB). In the first, PBSI agreed to purchase MLC's goodwill for $25,000, 90 percent of the face value of all accounts receivable (and remit to MLC any amounts collected above that amount), and up to 1.5 million mlc's above cost. The parties also signed a consulting agreement providing that Donaghy would serve as a consultant to PBSI for six months for a total fee of $25,000 (Def. Exh. AAA).

The closing took place in May, 1975, and pursuant to the agreement, PBSI purchased a total of 1,499,450 mlc's at a price of $142,282 (Def. Exh. WWW). It purchased 90 percent of MLC's receivables at a price of $103,500 (Def. Exh. VVV). PBSI collected the remaining receivables and remitted the proceeds—$11,174.71—to MLC. Thus, Donaghy received the following for the sale of MLC to PBSI:

| | |
|---|---|
| $ 25,000. | - MLC goodwill |
| $ 25,000. | - Donaghy consulting fee |
| $142,282. | - MLC inventory |
| $114,674.71 | - MLC accounts receivable |
| $306,956.71 | - total |

Of this, the following is profit: $25,000 for MLC goodwill; $25,000 consulting fee, because Donaghy's consulting work was limited to one or two phone calls or meetings; and $37,282 from the sale of inventory ($142,282 payment less cost of $105,000 (see Transcript, 1633–34, Def. Exh. BBBBBBBB). Thus, Donaghy's total profit from the sale of MLC was $87,282. Defendant's expert, Richard Kelsey, estimated that the value of MLC on May 1, 1975 was $76,000. This calculation was very thorough and based on valid assumptions about MLC and the future of its business and the mlc industry and the Court accepts it. Thus, Donaghy received $11,000 more than MLC was worth.

### F. *The Decline of the mlc Market*

If MLC had not sold its business to PBSI, it nevertheless would have faced declining sales for two main reasons. First, it was no longer the exclusive distributor for Philips mlc's, but had to compete with PBSI. Even if MLC could undersell PBSI, PBSI would no longer be purchasing mlc's from MLC, and a significant part of MLC's market would be lost. Second, personal computers using floppy disc storage began to replace P350-type business computers in the mid-1970's and the market for Philips business computers declined drastically. The number of P350 computers installed annually peaked at 877 in 1976 and dropped off markedly to 722 in 1977 and 438 in 1978 (Plaint. Exh. 104). While PBSI's sale of mlc's increased from 1975 through 1978, plaintiff concedes that starting in 1980 mlc sales would have declined (Plaint. Exh. 102). In 1979, PBSI ceased marketing the P350 in the United States.

### SUMMARY OF FINDINGS

The Court's findings of fact are summarized as follows:

1. In April, 1972, PBSI reached an agreement with MLC, Inc. under which PBSI transferred its exclusive mlc distributorship to MLC for no consideration. The agreement had no duration.

2. PBSI assisted MLC in obtaining business, dealing with the mlc manufacturers, and enforcing its exclusive distributorship. PBSI exerted a strong degree of control over MLC. PBSI did not compete with MLC for the sale of mlc's.

3. In late 1973, PBSI decided it wanted to re-enter the mlc market. Originally, PBSI planned to replace MLC. It enlisted the assistance of the German manufacturer in doing so, by, among other things, agreeing to sell mlc's exclusively to PBSI. This plan was never implemented.

4. With the assistance of NAPC's legal department, PBSI instituted a new plan under which it would enter the mlc market, instruct its branches to purchase mlc's only from it, and inform sales agents and other customers that PBSI could sell them cards.

PBSI would compete with MLC, and PBSI did not try to interfere with the Germans' sale of mlc's to MLC.

5. Donaghy eventually sold MLC to PBSI for a price greater than MLC's value. Had MLC continued in business, its sales would have decreased due to competition from PBSI and a slumping market for business computers and mlc's.

6. Under the terms of the blanket supply agreements, MD and J & K were the only authorized mlc manufacturers, and were given access to Philips' mlc specifications. In return for this, N.V. Philips, and through it, PBSI, had the right to designate mlc dealers. Although the specifications were confidential, and generally treated as such, PBSI personnel distributed them to prospective mlc manufacturers in the United States.

7. Neither PBSI, NAPC's counsel, nor Donaghy knew of the blanket supply agreements during the negotiations to create and sell MLC.

## CONCLUSIONS OF LAW

### I. SECTION ONE VIOLATION

Section One of the Sherman Act, 15 U.S.C. § 1, reads in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

■ In order to establish a violation of Section 1, MLC must first prove by a preponderance of the evidence that defendants entered into a conspiracy which unreasonably restrained trade. *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The existence of the conspiracy must be proved by evidence that tends to exclude the possibility of independent action. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

■ An agreement unreasonably restrains trade if the restraint was manifestly anticompetitive, and thus *per se* illegal, *Pennsylvania Dental Assoc. v. Medical Service Assoc. of Pennsylvania*, 745 F.2d 248, 255 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985), or if the restraint violates the "Rule of Reason", under which the " 'test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.' " *Indiana Federation of Dentists*, 106 S.Ct. at 2017, (*quoting Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918)). Vertical non-price arrangements between, for example, a manufacturer and a distributor are judged according to the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 57–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977).

■ The second element that MLC must prove to establish a violation of Section One is that it was injured and its injury was caused by PBSI's illegal restraint of trade. *Matsushita*, 106 S.Ct. at 1356. The injury must be caused by the type of behavior the antitrust laws were designed to prevent, namely, harm to competition. *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir.1980).

### A. *Illegal Restraint of Trade*

#### 1. *Price-fixing*

■ Plaintiff claims that defendants conspired with J & K and MD to fix prices of mlc's, which is a *per se* violation of Section One. *United States v. General Motors Corp.*, 384 U.S. 127, 147, 86 S.Ct. 1321, 1331–32, 16 L.Ed.2d 415 (1966). Plaintiff, however, has failed to show any agreement between J & K and MD to fix prices. Instead, the evidence shows that PBSI negotiated separate price agreements with J & K and MD, and that J & K and MD were aware of each other's prices and competed accordingly. Although J & K's and MD's prices were similar, price parallelism alone

is not sufficient to establish price fixing. *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 976 (9th Cir.1983). *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253–54 (2d Cir.1987).

 Plaintiff also argues that the agreement among J & K, MD and PBSI resulted in the elimination of MLC as a competitor to PBSI and thus permitted PBSI to control prices. MLC failed to introduce evidence that the purpose of the agreement was to allow PBSI to maintain prices of mlc's. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 130 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). MLC also failed to introduce evidence that PBSI had a sufficient share of the relevant market to exploit a monopoly without being hurt by interbrand competition. *Id.*, n. 5. The relevant market in this case is for small business computers. *MLC, Inc. v. North American Philips Corporation*, No. 78–6080, slip op. at 15–16 (S.D.N.Y. May 3, 1983) (Goettel, J.). PBSI did not have a sufficient market share to constitute a monopoly in the business computer market. *Id.* at 10. Due to the existence of such interbrand competition for business computers, PBSI was motivated to keep prices of mlc's low. *See Oreck*, 579 F.2d at 130, n. 5. Thus, even if the agreement had allowed PBSI to maintain mlc prices, it had no motivation to do so, and the agreement did not violate the rule of reason.

### 2. *Market Allocation*

 MLC's claim that PBSI's agreement to divide purchases between MD and J & K constitutes an illegal market allocation is without merit. While agreements by competitors at the same market level to divide markets so as to reduce competition are considered horizontal restraints and are condemned as *per se* illegal, *United States v. Topco Associates*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972), the evidence indicates that J & K and MD did not agree to divide the American mlc market. Rather, PBSI, a potential distributor, offered MD and J & K, two manufac-

turers at a different level of competition, half of PBSI's purchases in return for an exclusive distributorship of their mlc's.

 Market allocations or territorial restrictions may also be condemned as *per se* illegal if they are imposed by manufacturers on dealers so as to stifle horizontal competition. *See Topco*, 405 U.S. at 608–09, 92 S.Ct. at 1133–34; *United States v. Sealy, Inc.*, 388 U.S. 350, 352–53, 87 S.Ct. 1847, 1849–50, 18 L.Ed.2d 1238 (1967); *Pitchford v. Pepi, Inc.*, 531 F.2d 92, 103–04 (3d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1242–44 (3d Cir.1975). In these cases, however, manufacturers were responding to pressures from competitive dealers about intrusions by other dealers on assigned territories. There is no such evidence that MD and J & K were responding to such pressures. PBSI was not a competitor of MLC, but was seeking to replace MLC as an exclusive distributor. An exclusive dealership agreement is not a *per se* violation of Section 1. *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *Westman Commission Co. v. Hobart Corp.*, 461 F.Supp. 627, 637 (D.Col. 1978). Furthermore, even if PBSI were a competitor of MLC, an agreement between a manufacturer and a single dealer which has impact on another dealer is not *per se* illegal absent proof that the agreement promoted price-fixing or monopolization. *Oreck*, 579 F.2d 126, 130, n. 5. *See Monsanto*, 465 U.S. at 759, n. 6; 104 S.Ct. at 1468 n. 6. There is no such proof in this case. Finally, even if this case were similar to *Pitchford* and *American Motor*, the Second Circuit does not opprove of *per se* treatment for such arrangements. *Copy Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2d Cir.1981).

 MLC's challenge to the market allocation agreement under the rule of reason also fails. MLC failed to introduce any evidence that the agreement would tend to destroy intrabrand competition. In fact, the evidence indicates that there was no

intrabrand competition for either J & K mlc's or MD mlc's. Rather, the evidence indicates that MLC was the exclusive distributor for each brand of mlc's, and thus there was no price competition, at the retail level, within either brand of mlc. The agreement PBSI sought would merely have substituted one exclusive distributor for another. This would have had no impact on intrabrand competition.

The evidence also indicates that the exclusive distributorship PBSI sought would not have hurt interbrand competition for business computers or for MD and J & K mlc's. Such competition is the prime concern of the antitrust laws. *Ron Tonkin Gran Turismo v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1385–86 (9th Cir.), *cert. denied,* 454 U.S. 831; 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). As to business computers, there was no incentive for PBSI to increase the price of mlc's, as this would increase the operating price of Philips business computers, and limit its marketability. As to mlc's, MLC was purchasing from only one manufacturer, J & K. Thus, with MLC as distributor, there was no competition between J & K and MD. PBSI's initial plan to split its mlc purchases would have introduced another manufacturer into the picture, and although there might have not been strong price competition, it would have existed where there was none before. PBSI's desire to split its orders was also not motivated by price concerns, but was motivated by the legitimate desire to maintain two reliable sources for the critically important mlc's.

### 3. *Group Boycott/Refusal to Deal*

Plaintiff claims that the agreement between PBSI, J & K and MD constituted a *per se* illegal group boycott or refusal to deal. A group boycott by businesses at the same level of market organization against a competitor at that same level is *per se* illegal. *Klor's,* 359 U.S. at 212–213, 79 S.Ct. at 709–10; *General Business Systems,* 669 F.2d at 978. "[T]he *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discour-

age them from doing business with a competitor...." *Indiana Federation of Dentists,* 106 S.Ct. at 2018.

Plaintiff's argument that the agreement in this case would have created a horizontal group boycott fails. First, there was no horizontal agreement. The evidence indicates that PBSI, a supplier, sought distributorships from J & K and MD, the manufacturers, separately. Second, there would have been no horizontal effect on competition. MLC and PBSI were not competitors. MLC was an exclusive distributor of mlc's manufactured by MD and J & K, and PBSI—for legitimate business reasons—sought to become the exclusive distributor.

Plaintiff relies on *Klor's, supra,* in support of its argument that the agreement was *per se* illegal. In *Klor's,* however, the Supreme Court itself provided the language which distinguishes *Klor's.* "[*Klor's*] is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors, and a retailer." *Klor's,* 359 U.S. at 212–13, 79 S.Ct. at 710.

Plaintiffs also rely on *Com–Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982), and *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979). In *Com–Tel,* the court applied a *per se* analysis to a restraint imposed by a manufacturer on a distributor. The court found, however, that the manufacturer deviated from its own marketing strategy to single out an "unworthy" customer and that one distributor pressured the manufacturer to implement the restraint against its competitor, thus introducing a horizontal element into the case. *Id.* at 411. In this case, there was no horizontal element, since MLC and PBSI were not competitors. Furthermore, MD and J & K were not deviating from their market strategy to exclude MLC. *Cernuto* is also distinguished because the vertical restriction was motivated by price concerns, *Cernuto,* 595 F.2d at 168, an element not shown in this case.

For the reasons stated in the previous section, the agreement also satisfies the rule of reason.

### B. *Harm Arising from Antitrust Violations*

MLC's claim fails for another reason. There is no evidence that MLC was injured or, if it was injured, that it was caused by defendants' agreement with MC and J & K. PBSI never actually carried out its agreement with MD and J & K to exclude MLC. Rather, PBSI decided simply to enter the mlc market. PBSI purchased mlc's from MD and J & K for use at its branch offices, and in the end did not ask MD and J & K not to sell to MLC. PBSI did not obtain an exclusive distributorship from MD and J & K, and PBSI did not prohibit its sales agents or other mlc customers from purchasing mlc's from MLC. Once PBSI entered the market, Donaghy was afraid that PBSI's competition would put MLC out of business very easily, and sold MLC's assets to PBSI at a profit.

 Thus, even assuming that the 1974 agreement between PBSI, MD and J & K was an illegal restraint of trade, it did not injure MLC because the plan was never implemented. MLC's injury, if any, occurred when PBSI entered the mlc market, not as an exclusive distributor but as a competitor. This was a pro-competitive act. Such injury was assuaged when, a few months later, Donaghy sold MLC's assets to PBSI for a profit.

### II. WILSON TARIFF ACT CLAIM

MLC's eighth claim alleges a violation of the Wilson Tariff Act, 15 U.S.C. § 8. Plaintiff has not made arguments in its pre-trial or post-trial memoranda regarding the Wilson Tariff Act, and has apparently abandoned the claim. Furthermore, having failed to prove a violation of 15 U.S.C. § 1, plaintiff's claim under 15 U.S.C. § 8 also fails.

### CONCLUSION

The Court finds for the defendants on all of plaintiff's claims. The clerk is to enter judgment for defendants.

SO ORDERED.