# FEDERAL TRADE COMMISSION *v.* INDIANA FEDERATION OF DENTISTS

No. 84–1809.   Argued March 25, 1986—Decided June 2, 1986

WHITE, J., delivered the opinion for a unanimous Court.

*Marcy J. K. Tiffany* argued the cause for petitioner. With her on the briefs were *Solicitor General Fried, Assistant Attorney General Ginsburg, Ernest J. Isenstadt, David C. Shonka,* and *L. Barry Costilo.*

*Bruce W. Graham* argued the cause for respondent. With him on the brief was *Ronald K. Fowler.**

JUSTICE WHITE delivered the opinion of the Court.

This case concerns commercial relations among certain Indiana dentists, their patients, and the patients' dental health care insurers. The question presented is whether the Federal Trade Commission correctly concluded that a conspiracy among dentists to refuse to submit x rays to dental insurers for use in benefits determinations constituted an

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Retired Persons by *Alfred Miller* and *Steven S. Honigman;* for the Health Insurance Association of America by *Joe Sims* and *Edwin R. Soeffing;* and for the Washington Business Group on Health by *Stephan E. Lawton.*

Briefs of *amici curiae* urging affirmance were filed for the American College of Radiology by *Reuben L. Hedlund* and *James A. Cherney;* for the American Dental Association by *Peter M. Sfikas;* for the American Medical Association by *Benjamin W. Heineman, Jr., Carter G. Phillips, Newton N. Minow,* and *Jack R. Bierig;* and for the Physicians and Surgeons Association of Massachusetts, Inc., by *Robert D. Paul* and *Donald B. Gould.*

"unfair method of competition" in violation of § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45 (1982 ed. and Supp. II).

## I

Since the 1970's, dental health insurers, responding to the demands of their policyholders, have attempted to contain the cost of dental treatment by, among other devices, limiting payment of benefits to the cost of the "least expensive yet adequate treatment" suitable to the needs of individual patients. Implementation of such cost-containment measures, known as "alternative benefits" plans, requires evaluation by the insurer of the diagnosis and recommendation of the treating dentist, either in advance of or following the provision of care. In order to carry out such evaluation, insurers frequently request dentists to submit, along with insurance claim forms requesting payment of benefits, any dental x rays that have been used by the dentist in examining the patient as well as other information concerning their diagnoses and treatment recommendations. Typically, claim forms and accompanying x rays are reviewed by lay claims examiners, who either approve payment of claims or, if the materials submitted raise a question whether the recommended course of treatment is in fact necessary, refer claims to dental consultants, who are licensed dentists, for further review. On the basis of the materials available, supplemented where appropriate by further diagnostic aids, the dental consultant may recommend that the insurer approve a claim, deny it, or pay only for a less expensive course of treatment.

Such review of diagnostic and treatment decisions has been viewed by some dentists as a threat to their professional independence and economic well-being. In the early 1970's, the Indiana Dental Association, a professional organization comprising some 85% of practicing dentists in the State of Indiana, initiated an aggressive effort to hinder insurers'

efforts to implement alternative benefits plans by enlisting member dentists to pledge not to submit x rays in conjunction with claim forms.[1]   The Association's efforts met considerable success: large numbers of dentists signed the pledge, and insurers operating in Indiana found it difficult to obtain compliance with their requests for x rays and accordingly had to choose either to employ more expensive means of making alternative benefits determinations (for example, visiting the office of the treating dentist or conducting an independent oral examination) or to abandon such efforts altogether.

By the mid-1970's, fears of possible antitrust liability had dampened the Association's enthusiasm for opposing the submission of x rays to insurers.   In 1979, the Association and a number of its constituent societies consented to a Federal Trade Commission order requiring them to cease and desist from further efforts to prevent member dentists from sub-

---

[1] A presentation made in 1974 by Dr. David McClure, an Association official and later one of the founders of respondent Indiana Federation of Dentists, is revealing as to the motives underlying the dentists' resistance to the provision of x rays for use by insurers in making alternative benefits determinations:

"The problems associated with third party programs are many, but I believe the 'Indiana Plan' [i. e., the policy of refusing to submit x rays] to be sound and if we work together, we can win this battle.   We are fighting an economic war where the very survival of our profession is at stake.

"How long can some of the leaders of dentistry in other states be so complacent and willing to fall into the trap that is being set for us.   If only they would take the time, to see from whence come the arrows that are heading in our direction.   The Delta Dental Plans have bedded down with the unions and have been a party to setting up the greatest controls that any profession has ever known in a free society. . . .

"The name of the game is money.   The government and labor are determined to reduce the cost of the dental health dollar at the expense of the dentist.   There is no way a dental service can be rendered cheaper when the third party has to have its share of the dollar.

"Already we are locked into a fee freeze that could completely control the quality of dental care, if left on long enough."   FTC Complaint Counsel's Trial Exhibit CX 372A, F, App. 104.

mitting x rays. *In re Indiana Dental Assn.*, 93 F. T. C. 392. Not all Indiana dentists were content to leave the matter of submitting x rays to the individual dentist. In 1976, a group of such dentists formed the Indiana Federation of Dentists, respondent in this case, in order to continue to pursue the Association's policy of resisting insurers' requests for x rays. The Federation, which styled itself a "union" in the belief that this label would stave off antitrust liability,[2] immediately promulgated a "work rule" forbidding its members to submit x rays to dental insurers in conjunction with claim forms. Although the Federation's membership was small, numbering less than 100, its members were highly concentrated in and around three Indiana communities: Anderson, Lafayette, and Fort Wayne. The Federation succeeded in enlisting nearly 100% of the dental specialists in the Anderson area, and approximately 67% of the dentists in and around Lafayette. In the areas of its strength, the Federation was successful in continuing to enforce the Association's prior policy of refusal to submit x rays to dental insurers.

In 1978, the Federal Trade Commission issued a complaint against the Federation, alleging in substance that its efforts to prevent its members from complying with insurers' requests for x rays constituted an unfair method of competition in violation of § 5 of the Federal Trade Commission Act. Following lengthy proceedings including a full evidentiary hearing before an Administrative Law Judge, the Commission ruled that the Federation's policy constituted a violation of § 5 and issued an order requiring the Federation to cease and desist from further efforts to organize dentists to refuse to submit x rays to insurers. *In re Indiana Federation of Dentists*, 101 F. T. C. 57 (1983). The Commission based its ruling on the conclusion that the Federation's policy of requiring its members to withhold x rays amounted to a conspiracy in restraint of trade that was unreasonable and hence

---

[2] Respondent no longer makes any pretense of arguing that it is immune from antitrust liability as a labor organization.

unlawful under the standards for judging such restraints developed in this Court's precedents interpreting § 1 of the Sherman Act. *E. g., Chicago Board of Trade* v. *United States*, 246 U. S. 231 (1918); *National Society of Professional Engineers* v. *United States*, 435 U. S. 679 (1978). The Commission found that the Federation had conspired both with the Indiana Dental Association and with its own members to withhold cooperation with dental insurers' requests for x rays; that absent such a restraint, competition among dentists for patients would have tended to lead dentists to compete with respect to their policies in dealing with patients' insurers; and that in those areas where the Federation's membership was strong, the Federation's policy had had the actual effect of eliminating such competition among dentists and preventing insurers from obtaining access to x rays in the desired manner. These findings of anticompetitive effect, the Commission concluded, were sufficient to establish that the restraint was unreasonable even absent proof that the Federation's policy had resulted in higher costs to the insurers and patients than would have occurred had the x rays been provided. Further, the Commission rejected the Federation's argument that its policy of withholding x rays was reasonable because the provision of x rays might lead the insurers to make inaccurate determinations of the proper level of care and thus injure the health of the insured patients: the Commission found no evidence that use of x rays by insurance companies in evaluating claims would result in inadequate dental care. Finally, the Commission rejected the Federation's contention that its actions were exempt from antitrust scrutiny because the withholding of x rays was consistent with the law and policy of the State of Indiana against the use of x rays in benefit determination by insurance companies. The Commission concluded that no such policy existed, and that in any event the existence of such a policy would not have justified the dentists' private and unsupervised conspiracy in restraint of trade.

The Federation sought judicial review of the Commission's order in the United States Court of Appeals for the Seventh Circuit, which vacated the order on the ground that it was not supported by substantial evidence. 745 F. 2d 1124 (1984). Accepting the Federation's characterization of its rule against submission of x rays as merely an ethical and moral policy designed to enhance the welfare of dental patients, the majority concluded that the Commission's findings that the policy was anticompetitive were erroneous. According to the majority, the evidence did not support the finding that in the absence of restraint dentists would compete for patients by offering cooperation with the requests of the patients' insurers, nor, even accepting that finding, was there evidence that the Federation's efforts had prevented such competition. Further, the court held that the Commission's findings were inadequate because of its failure both to offer a precise definition of the market in which the Federation was alleged to have restrained competition and to establish that the Federation had the power to restrain competition in that market. Finally, the majority faulted the Commission for not finding that the alleged restraint on competition among dentists had actually resulted in higher dental costs to patients and insurers. The third member of the Court of Appeals panel concurred in the judgment solely on the ground that there was insufficient proof that cooperation with insurers was an element of dental services as to which dentists would tend to compete.

We granted certiorari, 474 U. S. 900 (1985), in order to consider the Commission's claim that in vacating the Commission's order the Court of Appeals misconstrued applicable principles of antitrust law and "'misapprehended or grossly misapplied' the substantial evidence test," *American Textile Manufacturers Institute, Inc.* v. *Donovan,* 452 U. S. 490, 523 (1981) (citation omitted). We now reverse.

## II

The issue is whether the Commission erred in holding that the Federation's policy of refusal to submit x rays to dental insurers for use in benefits determinations constituted an "unfair method of competition," unlawful under § 5 of the Federal Trade Commission Act. The question involves review of both factual and legal determinations. As to the former, our review is governed by 15 U. S. C. § 45(c), which provides that "[t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive." The statute forbids a court to "make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences." *FTC* v. *Algoma Lumber Co.*, 291 U. S. 67, 73 (1934). Rather, as under the essentially identical "substantial evidence" standard for review of agency factfinding, the court must accept the Commission's findings of fact if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474, 477 (1951); see also *Beneficial Corp.* v. *FTC*, 542 F. 2d 611, 616 (CA3 1976), cert. denied, 430 U. S. 983 (1977).

The legal issues presented—that is, the identification of governing legal standards and their application to the facts found—are, by contrast, for the courts to resolve, although even in considering such issues the courts are to give some deference to the Commission's informed judgment that a particular commercial practice is to. be condemned as "unfair." See *FTC* v. *Sperry & Hutchinson Co.*, 405 U. S. 233 (1972); *Atlantic Refining Co.* v. *FTC*, 381 U. S. 357, 367–368 (1965); *FTC* v. *Cement Institute*, 333 U. S. 683, 720 (1948). The standard of "unfairness" under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, see *FTC* v. *Cement Institute*, *supra*, at 689–695, but also practices that the Commission determines are against public policy for other reasons, see *FTC* v. *Sperry & Hutchinson Co.*, 405

U. S., at 244. Once the Commission has chosen a particular legal rationale for holding a practice to be unfair, however, familiar principles of administrative law dictate that its decision must stand or fall on that basis, and a reviewing court may not consider other reasons why the practice might be deemed unfair. See *id.*, at 245–250; cf. *SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943). In the case now before us, the sole basis of the FTC's finding of an unfair method of competition was the Commission's conclusion that the Federation's collective decision to withhold x rays from insurers was an unreasonable and conspiratorial restraint of trade in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. Accordingly, the legal question before us is whether the Commission's factual findings, if supported by evidence, make out a violation of Sherman Act § 1.

### III

The relevant factual findings are that the members of the Federation conspired among themselves to withhold x rays requested by dental insurers for use in evaluating claims for benefits, and that this conspiracy had the effect of suppressing competition among dentists with respect to cooperation with the requests of the insurance companies. As to the first of these findings there can be no serious dispute: abundant evidence in the record reveals that one of the primary reasons—if not *the* primary reason—for the Federation's existence was the promulgation and enforcement of the so-called "work rule" against submission of x rays in conjunction with insurance claim forms.

As for the second crucial finding—that competition was actually suppressed—the Seventh Circuit held it to be unsupported by the evidence, on two theories. First, the court stated that the evidence did not establish that cooperation with requests for information by patients' insurance companies was an aspect of the provision of dental services with respect to which dentists would, in the absence of some

restraint, compete. Second, the court found that even assuming that dentists would otherwise compete with respect to policies of cooperating or not cooperating with insurance companies, the Federation's policy did not impair that competition, for the member dentists continued to allow insurance companies to use other means of evaluating their diagnoses when reviewing claims for benefits: specifically, "the IFD member dentists allowed insurers to visit the dental office to review and examine the patient's x rays along with all of the other diagnostic and clinical aids used in formulating a proper course of dental treatment." 745 F. 2d, at 1143.

Neither of these criticisms of the Commission's findings is well founded. The Commission's finding that "[i]n the absence of . . . concerted behavior, individual dentists would have been subject to market forces of competition, creating incentives for them to . . . comply with the requests of patients' third-party insurers," 101 F. T. C., at 173, finds support not only in common sense and economic theory, upon both of which the FTC may reasonably rely, but also in record documents, including newsletters circulated among Indiana dentists, revealing that Indiana dentists themselves perceived that unrestrained competition tended to lead their colleagues to comply with insurers' requests for x rays. See App. to Pet. for Cert. 289a, 306a-308a. Moreover, there was evidence that outside of Indiana, in States where dentists had not collectively refused to submit x rays, insurance companies found little difficulty in obtaining compliance by dentists with their requests. 101 F. T. C., at 172. A "reasonable mind" could conclude on the basis of this evidence that competition for patients, who have obvious incentives for seeking dentists who will cooperate with their insurers, would tend to lead dentists in Indiana (and elsewhere) to cooperate with requests for information by their patients' insurers.

The Commission's finding that such competition was actually diminished where the Federation held sway also finds adequate support in the record. The Commission found that in the areas where Federation membership among dentists was most significant (that is, in the vicinity of Anderson and Lafayette) insurance companies were unable to obtain compliance with their requests for submission of x rays in conjunction with claim forms and were forced to resort to other, more costly, means of reviewing diagnoses for the purpose of benefit determination. Neither the opinion of the Court of Appeals nor the brief of respondent identifies any evidence suggesting that the Commission's finding that the Federation's policy had an actual impact on the ability of insurers to obtain the x rays they requested was incorrect. The lower court's conclusion that this evidence is to be discounted because Federation members continued to cooperate with insurers by allowing them to use more costly—indeed, prohibitively costly—methods of reviewing treatment decisions is unpersuasive. The fact remains that the dentists' customers (that is, the patients and their insurers) sought a particular service: cooperation with the insurers' pretreatment review through the forwarding of x rays in conjunction with claim forms. The Federation's collective activities resulted in the denial of the information the customers requested in the form that they requested it, and forced them to choose between acquiring that information in a more costly manner or forgoing it altogether. To this extent, at least, competition among dentists with respect to cooperation with the requests of insurers was restrained.

IV

The question remains whether these findings are legally sufficient to establish a violation of § 1 of the Sherman Act — that is, whether the Federation's collective refusal to cooperate with insurers' requests for x rays constitutes an "unreasonable" restraint of trade. Under our precedents, a

restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be *"per se"* unreasonable, or because it violates what has come to be known as the "Rule of Reason," under which the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade* v. *United States*, 246 U. S., at 238.

The policy of the Federation with respect to its members' dealings with third-party insurers resembles practices that have been labeled "group boycotts": the policy constitutes a concerted refusal to deal on particular terms with patients covered by group dental insurance. Cf. *St. Paul Fire & Marine Insurance Co.* v. *Barry*, 438 U. S. 531 (1978); *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30 (1930). Although this Court has in the past stated that group boycotts are unlawful *per se*, see *United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.* 359 U. S. 207 (1959), we decline to resolve this case by forcing the Federation's policy into the "boycott" pigeonhole and invoking the *per se* rule. As we observed last Term in *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.*, 472 U. S. 284 (1985), the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor—a situation obviously not present here. Moreover, we have been slow to condemn rules adopted by professional associations as unreasonable *per se*, see *National Society of Professional Engineers* v. *United States*, 435 U. S. 679 (1978), and, in general, to extend *per se* analysis to restraints imposed in the context

of business relationships where the economic impact of certain practices is not immediately obvious, see *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1 (1979). Thus, as did the FTC, we evaluate the restraint at issue in this case under the Rule of Reason rather than a rule of *per se* illegality.

Application of the Rule of Reason to these facts is not a matter of any great difficulty. The Federation's policy takes the form of a horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire—the forwarding of x rays to insurance companies along with claim forms. "While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *National Society of Professional Engineers, supra*, at 692. A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services, see *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc., supra; Chicago Board of Trade, supra;* cf. *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85 (1984)—such an agreement limiting consumer choice by impeding the "ordinary give and take of the market place," *National Society of Professional Engineers, supra*, at 692, cannot be sustained under the Rule of Reason. No credible argument has been advanced for the proposition that making it more costly for the insurers and patients who are the dentists' customers to obtain information needed for evaluating the dentists' diagnoses has any such procompetitive effect.

The Federation advances three principal arguments for the proposition that, notwithstanding its lack of competitive virtue, the Federation's policy of withholding x rays should not be deemed an unreasonable restraint of trade. First, as did the Court of Appeals, the Federation suggests that in the absence of specific findings by the Commission concerning the definition of the market in which the Federation allegedly restrained trade and the power of the Federation's members in that market, the conclusion that the Federation unreasonably restrained trade is erroneous as a matter of law, regardless of whether the challenged practices might be impermissibly anticompetitive if engaged in by persons who together possessed power in a specifically defined market. This contention, however, runs counter to the Court's holding in *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, *supra*, that "[a]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output," and that such a restriction "requires some competitive justification even in the absence of a detailed market analysis." *Id.*, at 109–110. Moreover, even if the restriction imposed by the Federation is not sufficiently "naked" to call this principle into play, the Commission's failure to engage in detailed market analysis is not fatal to its finding of a violation of the Rule of Reason. The Commission found that in two localities in the State of Indiana (the Anderson and Lafayette areas), Federation dentists constituted heavy majorities of the practicing dentists and that as a result of the efforts of the Federation, insurers in those areas were, over a period of years, actually unable to obtain compliance with their requests for submission of x rays. Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can

obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects." 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986). In this case, we conclude that the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.[3]

Second, the Federation, again following the lead of the Court of Appeals, argues that a holding that its policy of withholding x rays constituted an unreasonable restraint of trade is precluded by the Commission's failure to make any finding that the policy resulted in the provision of dental services that were more costly than those that the patients and their insurers would have chosen were they able to evaluate x rays in conjunction with claim forms. This argument, too, is unpersuasive. Although it is true that the goal of the insurers in seeking submission of x rays for use in their review of benefits claims was to minimize costs by choosing the least expensive adequate course of dental treatment, a showing that this goal was actually achieved through the means chosen is not an essential step in establishing that the dentists' attempt to thwart its achievement by collectively refusing to supply the requested information was an unreasonable restraint of trade. A concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the

---

[3] Because we find that the Commission's findings can be sustained on this basis, we do not address the Commission's contention that the Federation's activities can be condemned regardless of market power or actual effect merely because they constitute a continuation of the restraints formerly imposed by the Indiana Dental Association, which allegedly had market power throughout the State of Indiana.

market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence. *National Society of Professional Engineers* v. *United States,* 435 U. S. 679 (1978). Moreover, even if the desired information were in fact completely useless to the insurers and their patients in making an informed choice regarding the least costly adequate course of treatment—or, to put it another way, if the costs of evaluating the information were far greater than the cost savings resulting from its use—the Federation would still not be justified in deciding on behalf of its members' customers that they did not need the information: presumably, if that were the case, the discipline of the market would itself soon result in the insurers' abandoning their requests for x rays. The Federation is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand.

Third, the Federation complains that the Commission erred in failing to consider, as relevant to its Rule of Reason analysis, noncompetitive "quality of care" justifications for the prohibition on provision of x rays to insurers in conjunction with claim forms. This claim reflects the Court of Appeals' repeated characterization of the Federation's policy as a "legal, moral, and ethical policy of quality dental care, requiring that insurers examine and review all diagnostic and clinical aids before formulating a proper course of dental treatment." 745 F. 2d, at 1144. The gist of the claim is that x rays, standing alone, are not adequate bases for diagnosis of dental problems or for the formulation of an acceptable course of treatment. Accordingly, if insurance companies are permitted to determine whether they will pay a claim for dental treatment on the basis of x rays as opposed to a full examination of all the diagnostic aids available to the examining dentist, there is a danger that they will erroneously decline to pay for treatment that is in fact in the interest of

the patient, and that the patient will as a result be deprived of fully adequate care.

The Federation's argument is flawed both legally and factually. The premise of the argument is that, far from having no effect on the cost of dental services chosen by patients and their insurers, the provision of x rays will have too great an impact: it will lead to the reduction of costs through the selection of inadequate treatment. Precisely such a justification for withholding information from customers was rejected as illegitimate in the *National Society of Professional Engineers* case. The argument is, in essence, that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices. Such an argument amounts to "nothing less than a frontal assault on the basic policy of the Sherman Act." *National Society of Professional Engineers, supra,* at 695. Moreover, there is no particular reason to believe that the provision of information will be more harmful to consumers in the market for dental services than in other markets. Insurers deciding what level of care to pay for are not themselves the recipients of those services, but it is by no means clear that they lack incentives to consider the welfare of the patient as well as the minimization of costs. They are themselves in competition for the patronage of the patients—or, in most cases, the unions or businesses that contract on their behalf for group insurance coverage—and must satisfy their potential customers not only that they will provide coverage at a reasonable cost, but also that that coverage will be adequate to meet their customers' dental needs. There is thus no more reason to expect dental insurance companies to sacrifice quality in return for cost savings than to believe this of consumers in, say, the market for engineering services. Accordingly, if noncompetitive quality-of-service justifications are inadmissible to justify the denial of information to con-

sumers in the latter market, there is little reason to credit such justifications here.

In any event, the Commission did not, as the Federation suggests, refuse even to consider the quality-of-care justification for the withholding of x rays. Rather, the Commission held that the Federation had failed to introduce sufficient evidence to establish such a justification: "IFD has not pointed to any evidence—or even argued—that any consumers have in fact been harmed by alternative benefits determinations, or that actual determinations have been medically erroneous." 101 F. T. C., at 177. The evidence before the Administrative Law Judge on this issue appears to have consisted entirely of expert opinion testimony, with the Federation's experts arguing that x rays generally provide an insufficient basis, standing alone, for dental diagnosis, and the Commission's experts testifying that x rays may be useful in assessing diagnosis of and appropriate treatment for a variety of dental complaints. *Id.*, at 128–132. The Commission was amply justified in concluding on the basis of this conflicting evidence that even if concern for the quality of patient care could under some circumstances serve as a justification for a restraint of the sort imposed here, the evidence did not support a finding that the careful use of x rays as a basis for evaluating insurance claims is in fact destructive of proper standards of dental care.[4]

---

[4] It is undisputed that lay claims examiners employed by insurance companies have no authority to deny claims on the basis of examination of x rays; rather, initial screening of x rays serves only as a means of identifying cases that merit further scrutiny by the licensed dentists serving as consultants to the insurers. Any recommendation that benefits be denied or a less expensive course of treatment be pursued is based on the professional judgment of a licensed dentist that the materials available to him—x rays, claim forms, and whatever further diagnostic aids he chooses to consult—are sufficient to indicate that the treating dentist's recommendation is not necessary to the health of the patient. There is little basis for concluding that, where such a divergence of professional judgment exists, the treatment recommendation made by the patient's dentist should be

In addition to arguing that its conspiracy did not effect an unreasonable restraint of trade, the Federation appears to renew its argument, pressed before both the Commission and the Court of Appeals, that the conspiracy to withhold x rays is immunized from antitrust scrutiny by virtue of a supposed policy of the State of Indiana against the evaluation of dental x rays by lay employees of insurance companies. See Brief for Respondent 25–26, and n. 10. Allegedly, such use of x rays by insurance companies—even where no claim was actually denied without examination of an x ray by a licensed dentist—would constitute unauthorized practice of dentistry by the insurance company and its employees. The Commission found that this claim had no basis in any authoritative source of Indiana law, see 101 F. T. C., at 181–183, and the Federation has not identified any adequate reason for rejecting the Commission's conclusion. Even if the Commission were incorrect in its reading of the law, however, the Federation's claim of immunity would fail. That a particular practice may be unlawful is not, in itself, a sufficient justification for collusion among competitors to prevent it. See *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457, 468 (1941). Anticompetitive collusion among private actors, even when its goal is consistent with state policy, acquires antitrust immunity only when it is actively supervised by the State. See *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48, 57 (1985). There is no suggestion of any such active supervision here; accordingly, whether or not the policy the Federation has taken upon itself to advance is consistent with the policy of the State of Indiana, the Federation's activities are subject to Sherman Act condemnation.

## V

The factual findings of the Commission regarding the effect of the Federation's policy of withholding x rays are sup-

---

assumed to be the one that in fact represents the best interests of the patient.

ported by substantial evidence, and those findings are sufficient as a matter of law to establish a violation of § 1 of the Sherman Act, and, hence, § 5 of the Federal Trade Commission Act. Since there has been no suggestion that the cease-and-desist order entered by the Commission to remedy this violation is itself improper for any reason distinct from the claimed impropriety of the finding of a violation, the Commission's order must be sustained. The judgment of the Court of Appeals is accordingly

*Reversed.*