**Frederick W. WHITESIDE, Plaintiff–Appellee,**

v.

**SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellant.**

No. 86–6109.

United States Court of Appeals, Sixth Circuit.

Argued May 22, 1987.

Decided Dec. 11, 1987.

---

**1290**

Louis DeFalaise, U.S. Atty.. Lexington, Ky., John S. Osborn, III, William Kanter, Scott D. Earnshaw, Washington, D.C., Mary Beth McNamara, argued, Baltimore, Md., for defendant-appellant.

Frederick W. Whiteside, Lexington, Ky., John M. Rogers, argued, Lexington, Ky., for plaintiff-appellee.

Before KENNEDY, JONES and RYAN, Circuit Judges.

RYAN, Circuit Judge.

Defendant Secretary of Health and Human Services (the Secretary) appeals a decision of the district court permitting plaintiff Whiteside to retain social security benefits which the Secretary had previously determined were subject to deduction for an overpayment. The central issue is whether self-employment losses should be deducted from monthly wages in calculating monthly "excess wages" in a retiree's "grace year," as defined in 20 C.F.R. § 404.435 (1987), in order to determine whether the retiree's benefits are subject to "deductions on account of work" under 42 U.S.C. § 403(b) and (f).

We conclude that the Secretary correctly construed the statute as *not* permitting the deduction of self-employment losses from monthly wages, and that the district court's decision accordingly must be reversed. We also conclude that the question whether recovery of the overpayment should be waived has not been exhausted at the administrative level, and that a remand for an initial determination on waiver is in order.

## I.

Plaintiff Whiteside, an emeritus professor at the University of Kentucky College of Law, continued to teach after turning sixty-five, and did not immediately begin receiving social security benefits after his sixty-fifth birthday. At age sixty-six, however, he officially retired. His plans then were to work part-time. Accordingly, in January of 1979, he began to receive monthly retirement benefits, but he also began teaching one seminar at the College of Law, and making various expenditures in preparation for associating himself with a local law firm on a part-time basis.

The law practice did not produce income in 1979. For the seminar, however, Whiteside was paid $2,500 for work which extended from January till June. In June, Whiteside accepted an unanticipated offer of a full-time teaching position for the fall semester at Catholic University. Accordingly, he informed the Social Security Administration (the Administration) in August that he was temporarily returning to work full-time. At that time, an Administration claims representative led Whiteside to believe that he would be able to keep the benefits he had received from January until August. For the last four months of the year, no benefits were paid, and there is no dispute about the fact that Whiteside was not entitled to receive benefits then. He received $17,500 for work performed in the months September through December 1979. The only other income he had in 1979 was $200 for work for a continuing legal education program in July.

In 1982, the Administration advised Whiteside that there had been an overpayment of benefits of $2,627.60 in 1979. Whiteside appealed.

The key issue throughout this appeal has been whether Whiteside's expenses for setting himself up in private practice, $827, should be deducted from his monthly wages for the first six months of 1979, in order to determine whether he made too much money to be entitled to keep the full benefit payments he received. Under the pertinent regulation, 20 C.F.R. § 404.430(d)(ii), Whiteside's "monthly exempt amount" for 1979 was $375. Earnings over that amount would subject him to loss of benefits; earnings below that amount would entitle him to retain the full benefits he in fact received.

After a hearing, the (Administrative Law Judge) ALJ apportioned the $827 self-employment loss over all twelve months of 1979 and decided that this loss should be deducted from monthly wages for the purposes of the monthly exempt amount test. The ALJ also averaged the $2,500 Whiteside received for teaching the law seminar over the six months during which this work was performed. The pertinent calculations were:

1) Monthly wages of $416.67, January–June 1979;

2) Monthly self-employment loss of $68.91, January–December 1979; therefore,

3) Monthly earnings of $347.76, January–June 1979.

Because $347.76 is less than $375, Whiteside was entitled to keep the full amount of the benefits he received. The ALJ did not reach the issue of whether recovery of the overpayment should be waived, because he found that there was no overpayment.

The Appeals Council of the Administration thereafter reviewed this decision sua sponte and reversed, stating that there is no statutory or regulatory basis for deducting self-employment loss from monthly wages in this calculation. Thus, monthly earnings for the first six months of 1979 were found to be $416.67. Because this amount was over $375, the Appeals Council remanded for a determination of the exact amount of the overpayment and for an initial determination upon whether recovery of the overpayment should be waived.

Whiteside then brought this suit. A magistrate reviewed the record and decided that the ALJ was correct, and the Appeals Council wrong. The district court adopted this recommendation and reversed the Secretary's decision on the ground that self-employment loss should be deducted from monthly wages.

1292

## II.

■ The standard of review in this case has been much discussed but little analyzed. If this were a case in which the answer to the merits of the case appeared clearly in an agency's regulations, and the question for the court was whether those regulations should be upheld as an appropriate fulfillment of the intent of the statute, review would generally be

> limited to determining whether the Secretary has exceeded his statutory authority and whether the regulation is arbitrary and capricious.

*Herweg v. Ray*, 455 U.S. 265, 275, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982). However, in this case the dispute arises because neither the statute nor the appended regulations provide a clear answer to the issue raised by these unusual facts. Moreover, there has been no dispute about the initial findings of fact made by the ALJ; rather, the dispute is over the purely legal question of how the statute is properly interpreted. Substantial evidence review, the issue in *Mullen v. Bowen*, 800 F.2d 535 (6th Cir.1986) (en banc), is of no relevance to this inquiry.

Furthermore, the scope of this court's review is *not*, as both parties have instructed the court, "de novo." Although this court is not reviewing factual findings, but the application of legal principles, legal conclusions arrived at by an agency interpreting its organic statute are not without weight. As the Supreme Court explained:

> The interpretation put on the statute by the agency charged with administering it is entitled to deference ... but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.

*Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) (citations omitted). Thus, while legal issues are "for the courts to resolve,"

the courts in resolving such issues "are to give some deference" to an agency's interpretation. *Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445, 454 (1986).

The quantum of deference due is not negligible: "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. Federal Communications Comm'n*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). However, the weight accorded to administrative interpretations may vary, as the Supreme Court has explained:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

The question for this court, therefore, is not whose interpretation of the statute we prefer, but whether the Secretary's interpretation is reasonable, consistent, and persuasive.

## III.

■ The question remains whether, as Whiteside contends, this court's review must be limited to the precise factual scope of his appeal to the ALJ, that is, the three months for which the Administration initially found that an overpayment had been made. The Administration initially focused upon three months in early 1979 because Whiteside received only three paychecks for his six months of work teaching the seminar. The ALJ promptly corrected this

error, at Whiteside's urging, and apportioned his $2,500 from the College of Law over six months, in accordance with 20 C.F.R. § 404.428(b), which states that wages are earned when the services are rendered. Having taken advantage of this correct application of the law to diminish his monthly wages, Whiteside now seeks to limit the Appeals Council's review—and, consequently, our own—to the three months initially identified by the Administration.

On this question, *Mullen v. Bowen,* 800 F.2d 535 (6th Cir.1986) (en banc), is helpful. In that case, this court made it clear that the Appeals Council is free "to review on its own motion *any* action that was taken by an ALJ." *Id.* at 543 (emphasis in original). The implication of this reading of 20 C.F.R. § 404.969 is that the jurisdiction of the Appeals Council's review is not limited to issues raised by parties to the decision below. Moreover, 20 C.F.R. § 404.970(a)(2) permits sua sponte review wherever there has been an "error of law." It was clearly within the Appeals Council's proper role to correct errors made by the ALJ *and* by those who initially notified Whiteside of the overpayment.

## IV.

Section 203(b) & (f) of the Social Security Act, 42 U.S.C. § 403(b) & (f), provides for "Deductions on account of work" in order to decrease the amount of retirement benefits payable to individuals who are beyond retirement age (between 65 and 72) but are still earning money. Before the Act was amended in 1977, all those within this age group could collect full benefits for any year *or* any month during which earnings for that period were less than the benefits for that same period. Earnings beyond that threshold meant loss of one dollar of benefits for every two dollars of "excess earnings." In 1977, Congress became concerned that the monthly test of "excess earnings" was causing inequities, because people who were still working, and earning substantial wages, could also collect retirement benefits simply by limiting their work to certain months of the year. People whose work had always been seasonal, such as teachers, could even go on working as they had always done and still collect benefits during the months of unemployment—the summer months in the case of teachers.

The 1977 amendments, therefore, eliminated the monthly test for excess earnings except in the first taxable, usually calendar, year of retirement. This first year is called the "grace year" in the regulations. 20 C.F.R. § 404.435. The monthly test was retained for this first year so that it would still be possible for an individual to retire in mid-year, having already earned an income well beyond the annual earnings threshold, and begin collecting retirement benefits the very next month. This vestigial monthly earnings test thus avoids what would otherwise be an arbitrary inequity, that one who retired in January could begin receiving benefits that same month no matter how much he or she had earned in the previous year, while one who retired in June might have to wait until the following January to begin receiving benefits.[1]

---

**1.** The fullest description of the legislative intent appears in the House Conference Report on the bill:

*Monthly earnings test.*—The bill would change the retirement test so as to eliminate, for years after the initial year of retirement, the provision under present law that allows a beneficiary to receive full benefits for any month in which the beneficiary neither works for wages of more than the monthly measure nor renders substantial services in self-employment.

The present test, with a combined annual-monthly measure of earnings, creates an anomaly by permitting the payment of benefits in some situations where payment is diffi-

cult to justify. For example, a beneficiary who earns, say, $20,000 a year and who works regularly throughout the year has all benefits withheld. A beneficiary who earns the same amount, but works only part of the year, say 8 months, can receive benefits for the remaining 4 months. Also, people who customarily work less than a full 12 months each year (for example, in seasonal employment) can, upon reaching the age of eligibility for benefits, receive some social security benefits during the year even though their work patterns have not changed and their annual earning are substantial.

Your committee's bill would provide that the monthly measure would apply only in the

In this case, Whiteside's activities in 1979 do not fit the pattern Congress had in mind when it retained the monthly earnings test for the first year of retirement. In his first year, Whiteside "retired" to part-time work and then returned to full-time work for the final third of the year. As a result of his earnings during those final months, Whiteside earned well above the annual earnings threshold for 1979. Nonetheless, he still wishes to take advantage of the monthly earnings test for that year to retain the benefits paid to him for the first eight months of the year.

The Secretary does not challenge Whiteside's right to take advantage of the monthly earnings test. Although the intent of Congress was to "assure that a beneficiary who retires *after* earning a substantial amount in the year of retirement would get benefits for the months in that year in which the beneficiary actually was retired," H.R.Conf.Rep. No. 702, *supra*, note 1, at 4207 (emphasis added), there is nothing in the statute that would prohibit recourse to the test simply because one's high-earning months came after, rather than before, one's low-earning months in the first year of retirement. We cannot rely upon the legislative history to add a limitation on benefits that is plainly absent from the statute. However, the Secretary does challenge Whiteside's claim that he in fact meets the monthly test for the first six months of 1979.

The statute provides that deductions "shall be made" from retirement payments "on account of work" and "in such amounts ... as the Secretary shall determine." 42 U.S.C. § 403(b). Excess earnings for a taxable year are defined in § 403(f)(3), and earnings for a taxable year are defined in 403(f)(5)(A) as follows:

> An individual's earnings for a taxable year shall be (i) the sum of his wages for services rendered in such year and his net earnings from self-employment for

such year, minus (ii) any net loss from self-employment for such year.

No comparable definition of *monthly* earnings appears in the statute. Section 403(f)(1), however, describes the manner in which "an individual's excess earnings (as defined in paragraph (3)) shall be charged to months." One portion of this long and tortuous paragraph also provides that:

> [N]o part of the excess earnings of an individual shall be charged to any month ... in which such individual did not engage in self-employment and did not render services for wages (determined as provided in paragraph (5) of this subsection) of more than the applicable exempt amount....

§ 403(f)(1) & (f)(1)(E).

■ Whiteside's argument on this appeal is essentially that this cross-reference to paragraph (5) means that "wages," for the purposes of the monthly test, are defined in precisely the same manner as "earnings for a taxable year" are defined, because paragraph (5)(A), which contains the latter definition, must be intended by this cross-reference. The Secretary responds, cogently we believe, that (5)(A) does not contain a definition of "wages" at all, but a definition of "earnings," a concept which subsumes "wages," being, according to the definition, arrived at by netting wages, self-employment earnings, and self-employment losses. The cross-reference, in the Secretary's view, is to (5)(C), which is the portion of paragraph (5) which explains how "wages" in § 403 differ from "wages" in certain other sections of the Act and also explains what "[t]he term 'wages' does not include."

The Secretary thus contends that the monthly calculation is not directly analogous to the annual one. The statutory basis for the monthly test does *not* say that excess earnings shall not be charged to a month if "monthly earnings" exceed the applicable exempt amount. Section

---

initial year of retirement. This provision would assure that a beneficiary who retires after earning a substantial amount in the year of retirement would get benefits for the months in that year in which the beneficiary actually was retired.

H.R.Conf.Rep. No. 702, 95th Cong., 1st Sess. 50 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News. 4155, 4207.

403(f)(1)(E) says only that excess earnings shall not be charged if an individual "did not engage in self-employment and did not render services for wages ... of more than the exempt amount." Because this language is the only statutory explanation of the monthly test, the Secretary continues, there is no basis for assuming that an individual whose wages exceed the monthly exempt amount should be permitted to subtract self-employment loss from monthly wages in order to arrive at a figure below the exempt amount and retain the right to receive full benefits.

The rationale for this difference between the monthly and annual calculations, the Secretary suggests, is that the major thrust of the "grace year" monthly test, which was only retained as part of an overall move to eliminate monthly tests, was to see if an individual who claimed to be retired had in fact stopped working. As the legislative history stated, "The bill would eliminate the monthly measure of retirement and convert the retirement test to a strictly annual test after the initial year of retirement." H.R.Conf.Rep. No. 702, *supra* note 1, at 4172. The annual retirement test is generally effective in identifying those who continue to earn significant amounts of wages or self-employment income after reaching retirement age. The only additional function served by the monthly retirement test is to identify the particular month in which earning activities ceased. The amount of monthly earnings is thus secondary to the two indicators identified in the statute, (1) whether one is engaged in self-employment, and (2) whether one rendered services for wages of more than the exempt amount. In the Secretary's view, these two indicators tell how active a nominally "retired" person actually has been; reference to self-employment loss is intentionally omitted because it indicates nothing about how active one has been, and it may in fact detract from the utility of the other indicators, by suggesting low activity when one has actually been very active, but unsuccessful.

The regulations the Secretary has promulgated under this statute add little to the statutory language, but are consistent with the Secretary's view. The regulations define a "nonservice month" as one in which

> an individual, while entitled to retirement or survivors benefits—(1) does not work in self-employment (see paragraphs (d) and (e) of this section); (2) does not perform services for wages greater than the monthly exempt amount set for that month ... and (3) does not work in noncovered remunerative activity on 7 or more days in a month while outside the United States.

20 C.F.R. § 404.435(b). The third criterion refers only to the amount of "noncovered remunerative activity," not to the amount of noncovered earnings. The first criterion, as explained in the referenced paragraphs, defines "work in self-employment" as performing "substantial services" in the operation of a trade or business; "substantial services" are again defined, not in terms of the amount of money earned, but in terms of the amount of time expended: Section 404.447(a)(2) sets up a presumption that forty-five hours in a month are "substantial services." In this context, it would be anomalous to permit an individual to obscure the amount of work activity performed in a given month by subtracting an annual self-employment loss from monthly wages.

Whiteside responds that it is "logical" to define monthly excess the same way as annual excess, and that the Secretary's approach to monthly excess yields anomalous results in certain very specific circumstances. For example, an individual (like Whiteside) who is considered not to have worked in self-employment because he did not perform "substantial services," might, unlike Whiteside, be a modest success at that venture, while at the same time, like Whiteside, being the recipient of wages for part-time employment. This individual, under the Secretary's analysis, might collect full benefits for months during which wages and self-employment earnings combined exceeded the exempt amount, because the Secretary's interpretation of the statute permits neither the subtraction of self-employment losses from wages nor, apparently, the summing of wages and self-employ-

ment earnings. This is indeed an anomalous outcome, but no more anomalous, in terms of the purpose of the 1977 amendments, than the outcome Whiteside urges us to adopt in this case. Moreover, while it would be "logical" to define monthly and annual excess in the same way, it is also logical, in terms of that same legislative purpose, to define them differently.

In short, neither Whiteside nor the Secretary can claim that the other's position is precluded by clear statutory language. The statutory language in question is virtually unreadable, and demonstrably vague and ambiguous on points that are central here. The Secretary, however, provides a somewhat more reasonable reading of the statutory language by giving a more plausible explanation for the cross-reference in § 403(f)(1)(E) and by showing how his interpretation furthers the intent of Congress. The Secretary's interpretation is also consistent with the regulations he has promulgated under the statute. Accordingly, we consider the Secretary's interpretation persuasive and are content to defer to the administrative judgment.

### V.

The magistrate below recommended reversal of the Secretary's decision that there had been an overpayment; the magistrate nonetheless went on to address the merits of whether recovery should be waived if there was an overpayment. Section 204 of the Act, 42 U.S.C. § 404(b), provides:

**No recovery from persons without fault**

In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

The magistrate found in this case that "waiver should have been implemented" by the Secretary once it was determined that Whiteside had received an overpayment.

The magistrate evidently felt entitled to reach this issue because he had requested a determination of this issue by the Secretary, and the Secretary had replied that there had as yet been no fact-finding on that issue. In fact, the Secretary had ordered inquiry into whether waiver would be appropriate as part of the Appeals Council decision, but that inquiry has not yet taken place, because Whiteside responded to the decision by filing this action.

We think it would be quite inappropriate for this court to reach the issue of whether recovery should be waived in this case. There are well-established administrative remedies for Whiteside to follow in seeking waiver. He has not yet done so. *Rini v. Harris*, 615 F.2d 625 (5th Cir.1980), is not, as Whiteside's brief implies, precedent for dispensing with administrative exhaustion requirements with respect to waiver claims when "equity and good conscience" so require. The *Rini* case was initiated by a recipient who claimed entitlement to waiver from the start. There was no exhaustion issue before the Court of Appeals, as there is here.

### VI.

For these reasons, we agree with the Secretary's interpretation of the Social Security Act, 42 U.S.C. § 403(b) and (f), and hold that self-employment losses should not be subtracted from monthly wages to determine monthly excess in the first year of retirement. While neither the Secretary's interpretation nor Whiteside's is demanded by the statutory language, the Secretary's interpretation is consistent with the language of the statute, the legislative history of the 1977 amendments, and the associated regulations previously promulgated.

We REVERSE the district court's decision that there was no overpayment and reinstate the decision of the Appeals Council, which found that an overpayment had occurred and remanded for a determination of the precise amount of the overpayment and findings on whether waiver of recovery is called for here.

NATHANIEL R. JONES, Circuit Judge, dissenting.

The dispute in this case concerns the manner in which self-employment losses that occur in a beneficiary's "grace year" will be deducted from the beneficiary's earnings for that year. Because I find that the district court used the correct method of deduction, I respectfully dissent.

The question before the district court, and now before us, is a question of law, not of fact. The dispute centers entirely around the administrative law judge's ("ALJ's") interpretation of the applicable law. Indeed, the Appeals Council specifically noted that it was reviewing the ALJ's decision because the ALJ had made an "error of law."

Like other agency determinations of law, the Secretary's determination in this case is subject to a *de novo* review. *See, e.g., FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986). "Unlike factual findings, questions of law are freely reviewable by the courts, and courts are under no obligation to defer to the agency's legal conclusions." *Pennzoil Co. v. F.E.R.C.*, 789 F.2d 1128, 1135 (5th Cir.1986). Based upon this standard of review, a standard different than that employed today by the majority, I find that the interpretation of the statute as advanced by the plaintiff is more reasonable and logical than that advanced by the Secretary.

Although I disagree with the court's determination as to the overpayment of benefits to the plaintiff, I do agree that the issue of waiver, which is now applicable because of the majority opinion, should be remanded to the district court for a proper determination.