Ella M. DAVIS, Plaintiff–Appellant,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant–Appellee.

No. 87–6372.

United States Court of Appeals, Sixth Circuit.

Submitted Oct. 12, 1988.

Decided Feb. 13, 1989.

J. Randall Reinhardt, Bulleit, Kinkead, Irvin & Reinhardt, Lexington, Ky., Albert A. Bruchett, Prestonsburg, Ky., for plaintiff-appellant.

Louis DeFalaise, U.S. Atty., Lexington, Ky., Dennis R. Williams, Assistant Regional Counsel, Office of the Chief Counsel, Atlanta, Ga., for defendant-appellee.

Before MERRITT and RYAN, Circuit Judges, and POTTER, District Judge.*

RYAN, Circuit Judge.

Ella Davis appeals the district court's decision affirming the Secretary's determination to deny her survivor's insurance benefits based upon the account of her deceased husband. The Secretary denied Davis' application because he concluded her claim was governed by 20 C.F.R. § 404.305(b) (1987), which precludes the payment of survivor's benefits on the earnings record of an insured deceased if the survivor has been "convicted of a felony or an act in the nature of a felony of intentionally causing [the insured's] death."

The issue in this case is whether Davis' conviction of the felony of second-degree manslaughter in Kentucky disqualifies her, pursuant to 20 C.F.R. § 404.305(b), from receipt of survivor's benefits. We hold that it does and conclude that the Secretary's decision to deny Davis benefits is reasonable and consistent with both the regulation's language and its policy. We therefore affirm the district court's decision.

## I.

On May 19, 1982, plaintiff Ella Davis killed her husband, shooting him three times in the back with a .38 caliber pistol. The State of Kentucky indicted her for murder and a jury ultimately convicted her of second-degree manslaughter.

Kentucky defines second-degree manslaughter as wanton killing.

(1) A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person.

(2) Manslaughter in the second degree is a Class C felony.

Ky.Rev.Stat.Ann. § 507.040. Kentucky defines acting "wantonly" as follows:

"Wantonly"—A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

Ky.Rev.Stat.Ann. § 501.020(3).

Following Davis' conviction, and pursuant to 20 C.F.R. § 404.305(b) (1987), the Social Security Administration suspended Ms. Davis' survivor's benefits. Prohibiting some otherwise qualified survivors from receiving benefits, the regulation provides in relevant part:

(b) *Person's death caused by an intentional act.* You may not become entitled to or continue to receive any survivor's benefits or payments on the earnings record of any person if you were convicted of a felony or an act in the nature of a felony of intentionally causing that person's death.

*Id.* Following her parole, however, Davis requested that the administration reinstate her survivor's benefits, alleging that Kentucky had not convicted her of intentionally causing the insured's death and that, therefore, she was not disqualified from entitlement. She requested a *de novo* hearing after her petition was twice denied by the Secretary.

* The Honorable John W. Potter, United States District Judge for the Northern District of Ohio, sitting by designation.

In his decision denying Davis survivor's benefits, the Administrative Law Judge ("ALJ") made the following observation:

The claimant's conviction of second degree manslaughter requires that the jury find that she wantonly caused the death of another person. Wantonly, as described in the Statute, refers to an awareness and conscious disregard of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. It further requires that the risk be of such nature and degree that disregard constitutes gross deviation from the standard of conduct of a reasonable person. The claimant was convicted of having shot the wage earner three times in the back, and I am persuaded that the facts justify a conclusion that her acts had sufficient intent to meet the requirements of Section 404.305. That being the case, I am bound by the Regulations of the Social Security Administration and must conclude that the claimant is not entitled to survivor's benefits on the wage earner's account.

The Secretary adopted the ALJ's findings and Davis appealed to federal district court.

The district court concluded that the Secretary could invoke the forfeiture provision of 20 C.F.R. § 404.305(b) under these circumstances despite the jury's implicit finding that Davis did not possess a specific intent to kill state of mind when she shot her husband. Davis argues that the district court erred in affirming the Secretary's decision because 20 C.F.R. § 404.305(b) "requires that the disqualifying conviction be one involving an *intentional* mental state" as defined by the convicting state's criminal code.

## II.

This appears to be a case of first impression.[1] Yet this court does not write on an entirely clean slate despite both a lack of precedent and the fact that the dispute is over the purely legal question of how this regulation is properly to be interpreted, because an agency's legal conclusion arrived at through interpretation of its own regulation is not without weight. In *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981) (citations omitted), the Supreme Court explained:

The interpretation put on the statute by the agency charged with administering it is entitled to deference ... but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.

"Thus, while legal issues are 'for the courts to resolve,' the courts in resolving such issues 'are to give some deference' to an agency's interpretation," *Whiteside v. Secretary of Health & Human Services*, 834 F.2d 1289, 1292 (6th Cir.1987) (quoting *Federal Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986), and should follow "the construction of a statute by those charged with its execution ... unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. Federal Communications Comm'n*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

A regulation is invalid if in enacting it "the Secretary has exceeded his statutory authority" or "the regulation is arbitrary and capricious," and therefore fails to fulfill the intent of the statute. *Herweg v. Ray*, 455 U.S. 265, 275, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982). An agency's interpretation of a regulation is invalid when it does not comport with the actual language of the regulation. *Fluor Con-*

---

1. Appellant cites *Cooley v. Weinberger*, 518 F.2d 1151 (1975), as support for its proposition that the state of mind of the final conviction alone is relevant for invocation of the disqualifying regulation. But *Cooley* did not deal with the same regulation and, more importantly, did not address whether convictions for homicides lacking specific intent to kill might disqualify a survivor because the survivor in *Cooley* was convicted of a specific intent offense.

*structors, Inc. v. Occupational Safety & Health Review Comm'n,* 861 F.2d 936, 939 (6th Cir.1988). As we stated in *Whiteside,* when reviewing an agency's interpretation of its own regulations, "[t]he question for this court ... is not whose interpretation of the statute we prefer," but whether we are persuaded that the Secretary's interpretation is reasonable and consistent with the regulation's language. 834 F.2d at 1292. "An agency is bound by the regulations it promulgates and may not attempt to circumvent the amendment process through changes in interpretation unsupported by the language of the regulation." *Fluor Constructors,* 861 F.2d at 939 (citing *United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3101–02, 41 L.Ed.2d 1039 (1974)).

### III.

Plaintiff does not challenge the Secretary's authority to promulgate this regulation, justified on the ground that one should not profit from intentionally causing another's death. *See, e.g.,* 52 Fed.Reg. 19135 (May 21, 1987). Rather, she argues that because it was not required to be shown that she *intentionally* caused her husband's death for purposes of her conviction under the Kentucky second-degree manslaughter statute, it follows therefore that she did not intentionally cause death within the meaning of 20 C.F.R. § 404.305(b). Quite aside from the obvious invalidity of that syllogism, because neither the language of the regulation nor the Secretary's definition of intentional homicide for purposes of the regulation limits its application as Davis argues, we cannot say that the Secretary erred in adopting the ALJ's conclusion that Davis' act met the regulation's intent requirement.

First we note that the Secretary's opinion that the regulation may apply to homicide convictions other than for crimes involving a specific intent to kill is not unreasonable since the regulation does not, on its face, clearly limit its application to specific intent convictions. The language of the regulation taken as a whole is ambiguous, to say the least, in that it is unclear whether the word "intentionally" in the phrase "intentionally causing that person's death" refers only to the voluntary performance of a life threatening act or requires a death-desiring state of mind. The prefatory phrase that identifies the regulation seems to indicate that the nature of the act is crucial for it indicates that the regulation applies where "[insured's] death [is] caused by an intentional act." The next sentence, however, introduces an ambiguity because it does not indicate that benefits are denied only to those convicted of a felony or an act in the nature of a felony of intentionally *acting* to cause an insured's death. Rather, it seems to stress the result, indicating that benefits are to be withheld from those "convicted of a felony or an act in the nature of a felony of intentionally *causing* [the insured's] death" (emphasis added).

Because the regulation raises but fails to answer its state of mind requirement, we must look elsewhere. When Kentucky sought to determine whether Davis intentionally caused her husband's death within the meaning of its criminal law, it turned to the definitional section of the Kentucky statute. Davis urges this court likewise to turn to Kentucky's definition of intentional homicide to resolve this issue. We believe, however, that the proper definition of "intentionally" as it appears in the regulation must be the definition given it by the administrative body drafting the regulation. Resort to the Secretary's single definition of intentional homicide also forecloses the possibility that claimants from different states might receive non-uniform treatment by the administration.[2] Thus, we turn to the Secretary's definition of intentional homicide for purposes of this regulation.

2. A desire for uniform treatment would also appear to be the purpose of the Administration's decision not only to apply 20 C.F.R. § 404.305(b)'s disqualification provisions to acts that a state classifies as a "felony," but also to acts in their nature. A felony homicide in one state may not be considered a felony in another. By permitting the Secretary to treat similar acts similarly despite varying state "seriousness" classifications, claimants are assured of uniform treatment.

■ The meaning of "intentional" for purposes of applying 20 C.F.R. § 404.305(b) is construed in the *Program Operations Manual System* (POMS) at GN 00304.115. Although the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law, it is nevertheless persuasive. *Evelyn v. Schweiker,* 685 F.2d 351 (9th Cir.1982). The POMS explains the meaning of Social Security Act terms as well as the meaning intended by terms appearing within the regulations. *Powderly v. Schweiker,* 704 F.2d 1092 (9th Cir.1983). The POMS provides, in pertinent part:

00304.115  Meaning of Intentional Homicide

A.  General

Intent generally refers to the purpose(s) for doing an act—a wish or an expectancy that the act will have a certain result (regardless of the actual likelihood of such a result). Intent has also been defined as the presence of will in the commission of a criminal act where the individual is fully aware of the nature and probable consequences of the act which is to be done. This applies whether the individual desires that such consequences occur or is indifferent as to their occurrence. Since intent is a state of mind, it is seldom established by direct proof but must be inferred from facts. Examples of situations where intentional homicide with respect to an individual will be found are: An individual actually desires the death of the WE [wage earner] to result from his or her act; an individual commits an act which he or she knows could result in the death of the WE even though the WE's death is not actually desired (except as noted below).

The following cases are excluded from intentional homicide:

1.  Homicides which are the result of an accident;

2.  Homicides where the killing is the result of self-defense;

3.  Homicides where the claimant was insane or under the influence of drugs or alcohol (to the extent that he or she was unaware of the nature and consequences of the act) when he or she killed the WE.

*Social Security Administration Program Operations Manual System* (POMS), GN 00304.115. *See also Social Security Law and Practice,* Part 4 § 29:93 (Lawyers Cooperative 1987).

■ In defining "intentional homicides" for purposes of applying 20 C.F.R. § 404.305(b), the Secretary's guidelines expand on the traditional meaning of an intentional state of mind in order to exclude from disqualification only: 1) accidental homicide (involuntary manslaughter might fall within this exception); 2) justifiable homicide (generally self-defense); or 3) excused homicide (insane or influenced by intoxication). Thus, while disqualification would obviously result from any murder conviction because murder requires a specific intent that the wrongful conduct will result in another's death, for our purposes the guidelines also include within their definition of an intentional homicide the commission of "an act which [the actor] knows could result in the death of the [wage earner] even though the [insured's] death is not actually desired." Thus, a conviction for the indifferent performance of a voluntary act that the actor knows is potentially fatal to another, even if the death of the other is not specifically intended, disqualifies the actor from eligibility for survivor's insurance benefits.

The Secretary properly adopted the ALJ's recommendation to deny benefits pursuant to 20 C.F.R. § 404.305(b) because Davis' second-degree manslaughter conviction falls within the regulation's definition of an intentional homicide. Kentucky defines wanton conduct as awareness of and conscious disregard of a substantial and unjustifiable risk that death may result from a particular course of conduct. The conduct for which Davis was convicted falls within the Secretary's definition of "intentional" and it was neither capricious nor unreasonable for the Secretary to have defined such conduct as intentional in order to ensure that convicted killers do not bene-

fit from the deaths of insured wage earner victims.

AFFIRMED.