SHADUR, District Judge,
dissenting:
Some 30 years ago the Mark Harris novel Bang the Drum Slowly was made into a critically acclaimed motion picture of the same name, with the then-little-known Robert DeNiro playing one of the two protagonists and the equally-little-known Michael Moriarty playing the other. Although the film’s subject matter was baseball, its larger theme provided keen insights into the human condition.
DeNiro’s role was that of unlettered Georgia rustic Bruce Pearson — a rube with the same quality of naivete that was captured by Ring Lardner in such works as Letters from a Busker, You Know Me, Al and Alibi Ike — whose life-threatening affliction with Hodgkins disease was unknown to his teammates, the team manager and the owner. Only star pitcher Henry Wiggin,[1] played by Moriarty, knew of the fatal illness and of Bruce’s deteriorating condition — and he used his leverage as the team’s key man to force management, without his explaining the reason, to keep Bruce (a relief catcher of limited ability) on the team roster.
Bruce, the hapless catcher played by DeNiro, was the target of constant ragging by his teammates because of his unworldliness — including their victimizing him as an invariable loser in their perpetual card game of TEGWAR, no matter what cards he held. When, in response to the effort by the Moriarty character to wise him up, Bruce answered that he had no idea why he lost every time — perhaps he was just a bad card player — the Moriarty-DeNiro exchange went something like this:
“Don’t you know what TEGWAR stands for?”
“No.”
“It’s The Exciting Game Without Any Rules.”
*1140 What is all of this doing in a dispute between U.S. Cellular and the City of Broken Arrow? This is after all supposed to be an opinion (albeit a dissenting one), not a movie review. But it could not be more relevant, because the City Council in Broken Arrow has outdone TEGWAR with an even more egregious brand of anarchy: It has in fact prescribed a set of rules, but when U.S. Cellular has then conformed meticulously to every one of the prescribed standards, the Broken Arrow response has been “Too bad — you lose anyway.” And regrettably the majority opinion has sanctioned that level of lawlessness on the City’s part.
It is, I suggest, impossible to read the record as to U.S. Cellular’s two rejected applications for special use permits for the construction of cellular transmission towers without being convinced that the rejection of those applications was foreordained, irrespective of U.S. Cellular’s satisfaction of all of the standards established by Broken Arrow’s own ordinance dealing with that subject. But it is not necessary, I believe, to go through such a painstaking (and painful) exercise to demonstrate why the results of our appellate review should be the opposite of those arrived at by the majority: the affirmance rather than the reversal of one district court’s judgment that had rejected the City’s denial of application SP-149, and the reversal rather than the affirmance of the other district court’s upholding of the denial of application SP-150. Instead it should suffice, I think, to point to two fatal flaws in each of Broken Arrow’s permit denials.
To begin with, it must be remembered that it was the City Council that reached each of the decisions here, not the City’s staff people who provided potential input for those decisions both pre-decision (most recently by the Planning Commission) and, more distressingly, post-decision (by the Planning Director). And here is the entire record of the Council’s vote and of its two stated reasons for the turndown in SP-150:
Mr. McCaleb: I move to deny.
Mr. Petrik: I’m going to second that for a couple of reasons. One, there is three existing towers close to it. There is — and that’s cell towers; there’s a couple of tv antennas that could very well take the — the wind load from — from this; and I think there are better locations for this tower.
Mr. Reynolds: So we have a motion and a second for denial. Any other discussion? No? Okay. We’ll call roll.
Mr. Heinrichs: Councilman McCaleb?
Mr. McCaleb: Yes.
Mr. Heinrichs: Councilman Thurman?
Mr. Thurman: Yes.
Mr. Heinrichs: Councilman Carter?
Mr. Carter: Yes.
Mr. Heinrichs: Vice Mayor Petrik?
Mr. Petrik: Yes.
Just as has to be true of any government controlled by law, those who vote on such a governmental action must be viewed as having done so only in the particular terms that they themselves have marked out. So too, the even more terse record of the vote in SP-149 necessarily reflects the actual City Council decision there: an affirmative vote on a motion that was based entirely on two specified grounds:
Motion by Petrik, second by Carter to deny SP-149 as the required setback will inhibit residential growth and there are alternate locations available.
It simply will not do — as was the ease here in both instances- — for an administrative employee, a nondecisionmaker, the City’s Planning Director, to inject other reasons post-hoc as to why the City Council might have reached the same conclusions, but that the City Council itself did not articulate in its vote — its decision. In *1141 deed, when any administrative decision-maker is presented with a host of possible reasons for reaching a decision but then limits its own statement in support of the announced decision to fewer than all of those possibilities, it distorts the decisional process seriously to operate on the premise that the omitted reasons apply as well. As a unanimous United States Supreme Court has taught in FTC v. Indiana Federation of Dentists, 476 U.S. 447, 455, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986):
Once the Commission has chosen a particular legal rationale for holding a practice to be unfair, however, familiar principles of administrative law dictate that its decision must stand or fall on that basis, and a reviewing court may not consider other reasons why the practice might be deemed unfair.
Accord, rejecting “post hoc rationalizations for agency action” (in that instance proffered after the fact by appellate counsel rather than, as here, by administrative staffers), Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), a decision cited and quoted with approval by this court in Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574-75 (10th Cir.1994).[2]
Here Congress has decreed that under the Telecommunications Act it is the actual “decision by a State or local government or instrumentality thereof,” and not what might have been its decision, that must be “supported by substantial evidence.” Although the statute also requires a “written record,” that does not permit, as the majority would have it, a retrospective rewrite that does not track — that goes far beyond — the actual decision. In this instance the written record of what the City Council actually decided is embodied in the transcripts of its proceedings and meeting minutes that I have quoted earlier. In those terms the bulk of the majority’s extended rationale falls away, and what little remains — what speaks to the two reasons advanced in each of the City Council’s actual votes — does not even begin to approach the statutory standard.
There is no occasion, because I do not speak for the court, to itemize here just how unsupported the City Council’s own specified reasons for its decisions were in any relevant factual sense. Suffice it to say that the City Council’s contemporaneously stated reasons (not the other post-hoc rationalizations) for its two turndown votes simply do not satisfy the “substantial evidence” requirement of the Telecommunications Act, a conclusion that has been amply demonstrated by U.S. Cellular in each instance. And that being so, the reasons that have been found sufficient by the majority — reasons that were advanced by Broken Arrow’s Planning Director’s letters after the fact to bolster the turn-downs — are entirely beside the mark.
There is one other aspect of the two rejections that also bears special mention: the distortion of Broken Arrow’s own zoning ordinance to find fault with U.S. Cellular for not having sought and obtained rezoning of the two properties before proceeding with its applications for permission to build the telecommunications towers. Section 15.5 of Broken Arrow’s zoning ordinance expressly provides that “no new *1142 use may be commenced on land which is assigned transitional zoning without obtaining appropriate conventional zoning” (emphasis added). What that ordinance does not say is that no permit that would allow such use must be obtained before the necessary zoning change is sought.
Here U.S. Cellular specifically agreed, as a condition to its obtaining each special use permit, to pursue all required platting and zoning changes so that no actual use of that permit — no use of the property for a tower — could be commenced until the proper zoning was in place. And that represented an eminently reasonable ordering of events, for it would clearly make no sense for U.S. Cellular to be required to go ahead with the trouble and expense of seeking rezoning until it knew that it could use the properties for the desired purposes.
In sum, Congress has enacted the Telecommunications Act for a dual purpose: to facilitate the growth of wireless telephone service on a national basis, while at the same time preserving local control — subject to specified restrictions — over the siting of towers. What the majority has permitted Broken Arrow to do, I submit, is to subvert the careful balance prescribed by Congress. Accordingly, I respectfully dissent.

. One indicium of Bruce’s slowness of perception was that all of the other players, knowing that Wiggin was an aspiring writer, referred to him by the nickname "Author.” Bruce mistakenly caught that as "Arthur” — so he invariably addressed the Moriarty character by that name.

. This case’s posture differs sharply from the situation in which a reviewing court will uphold a lower court’s decision if any line of analysis supports the result reached. In the administrative review context, the decisions exemplified by Indiana Federation and Motor Vehicle Mfrs. prescribe — whether to guard against arbitrary action by such nonjudicial decisionmakers or otherwise — that the decision under review must comprise both the announced result and the stated reasons for reaching it.