# United States Court of Appeals
# for the Federal Circuit

_____

**UNITED STATES CAPITOL POLICE,**
*Petitioner*

**v.**

**OFFICE OF COMPLIANCE,**
*Respondent*

**FRATERNAL ORDER OF POLICE, U.S. CAPITOL POLICE LABOR COMMITTEE,**
*Intervenor*

---------------------------------------------------------------------------------

**OFFICE OF COMPLIANCE,**
*Petitioner*

**FRATERNAL ORDER OF POLICE, U.S. CAPITOL POLICE LABOR COMMITTEE,**
*Intervenor*

**v.**

**UNITED STATES CAPITOL POLICE,**
*Respondent*

_____

2016-2712, 2017-1024
_____

Petitions for review of a decision of the Board of Directors of the Office of Compliance in No. 15-LMR-01 (CA).

———————————

Decided: January 8, 2018

———————————

KELLY MARISSA SCINDIAN, Office of Employment Counsel, United States Capitol Police, Washington, DC, argued for United States Capitol Police. Also represented by RAFIQUE OMAR ANDERSON, FREDERICK M. HERRERA.

JOHN UELMEN, Office of the General Counsel, United States Office of Compliance, Washington, DC, argued for the Office of Compliance. Also represented by HILLARY BENSON, JULIA AKINS CLARK.

SARA L. FAULMAN, Woodley & McGillivary LLP, Washington, DC, argued for intervenor. Also represented by MEGAN KATHLEEN MECHAK.

———————————

Before NEWMAN, CLEVENGER, and CHEN, *Circuit Judges.*

CHEN, *Circuit Judge.*

The United States Capitol Police (USCP) petitions for review of the decision of the Board of Directors of the Office of Compliance (Board) affirming the Hearing Officer's finding that the USCP engaged in unfair labor practices when it issued Officer James Konczos a Command Discipline Warning in response to Officer Konczos's protected union activity. "Protected activity" refers to the right to "form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal." 5 U.S.C. § 7102. Here, the Hearing Officer found that Officer Konczos was disciplined for expressing dissatisfaction with the USCP's unscheduled

shift, emergency holdover, policy. For its part, the Office of Compliance (OOC) seeks an order from this court enforcing the Hearing Officer's Order. This Order requires the USCP to cease and desist from violating the Congressional Accountability Act (CAA); expunge the discipline issued to Officer Konczos from its records; post a notice to employees informing them that the USCP has engaged in unfair labor practices; and certify its compliance with the Order. Because substantial evidence shows that Officer Konczos was disciplined for engaging in protected union activity, we affirm the Board's decision. Because the OOC's cross appeal does not enlarge the scope of the judgment, it is unnecessary for us to reach the cross appeal.

BACKGROUND

A. Emergency Holdover Shift

This appeal stems from a dispute over the USCP's practice of requiring officers to work a double-shift when the need arises, sometimes informing an officer about the extra shift only at the last minute. The Collective Bargaining Agreement (CBA) negotiated between the Fraternal Order of Police (FOP), U.S. Capitol Police Labor Committee, and the USCP defines "unscheduled additional duty," also known as an emergency holdover, as a manpower need that arises during the current tour of duty. When an emergency manpower need arises, the CBA permits the USCP to require officers on the current tour to be held over to fill posts on a subsequent tour. This is what happened to Officer Konczos who was told near the end of his 11:00 p.m. to 7:00 a.m. shift that he would need to stay on to work the 7:00 a.m. to 3:00 p.m. shift.

At approximately 5:50 a.m. on June 26, 2014, Sergeant James Floyd telephoned Sergeant Danny McElroy informing him that he needed two officers to be held over from the Capitol Visitor Center (CVC) 11:00 p.m. to

7:00 a.m. Section C-1 shift to work the 7:00 a.m. to 3:00 p.m. CVC C-2 shift.[1]

At 6:10 a.m., Sergeant McElroy contacted Officer Konczos, who was working his regular 11:00 p.m. to 7:00 a.m. C-1 shift in the House Intelligence Area, to notify Officer Konczos that he had been drafted to cover the 7:00 a.m. to 3:00 p.m. C-2 shift at the North Screening Door of the CVC.  Officer Konczos responded that he could not work the shift because he needed to take his car for service in time to report to his regularly scheduled shift at 11:00 p.m.  Sergeant McElroy informed Officer Konczos that this did not excuse him from working the additional shift, but that he could "1301 it away."  The term "1301" refers to Article 18, Section 18.03 of the CBA between the USCP and the FOP.  By completing a CP-1301 form, an officer can obtain a qualified substitute to work an additional shift in his or her place.  However, a 1301, by its express terms, applies when an officer has more than 24 hours prior to the beginning of the additional, scheduled shift to obtain a qualified substitute.  J.A. 768–80 (Standard Operating Procedure COP-USB-003).

At 6:30 a.m., shortly after the phone call between Sergeant McElroy and Officer Konczos, Officer Carlos Ford—a USCP Officer who assists other officers in finding qualified substitutes—called Officer Konczos to inform him that Officer Albert Law had agreed to work the C-2 shift.  Officer Law then sent a text message to Officer Konczos to complete a CP-1301 form.  Officer Konczos replied via text, "you can if you want, I'm not staying."  Officer Law also called Sergeant Floyd, the supervisor for the C-2 holdover shift, to inform him that he (Law) would be working the holdover shift in place of Officer Konczos.

---

[1] The CVC Section C-1 shift covers the House Intelligence Area.  The CVC Section C-2 shift covers the North Screening Door.

An email from Lieutenant Kathleen McBride sent at 7:44 a.m. confirmed that Sergeant Floyd was aware of the substitution.

At 6:44 a.m., Officer Konczos emailed USCP Police Chief Kim Dine with the subject line "Unscheduled drafts." J.A. 630. The email reminded Chief Dine that Officer Konczos, as Chairman of the FOP, had previously raised the issue of emergency holdovers with him numerous times at regularly scheduled labor-management relations meetings without a satisfactory solution:

> In numerous emails and face to face meetings we have addressed this issue [unscheduled drafts] with you. . . . As I explained to you before, the unscheduled drafts do nothing but disrupt officers['] lives, this happens just about every day, every section, every division. How fair do you think it is for an officer to be told at the last minute that they are drafted . . . for 8 hours?? Please don't tell me you are looking into manpower numbers, we have heard that for months.

*Id.* Officer Konczos then referred to his own situation that morning, when he was drafted with little advanced notice for a holdover shift. *Id.* And he criticized the disruptive nature of emergency holdovers on officers' lives. *Id.* Officer Konczos ended his email: "I fully expect to be suspended at 7:00 a.m., but I'm to the point I honestly don't care." J.A. 630–31. At 7:15 a.m., Officer Konczos was relieved at his post by the officer scheduled to work the next C-1 shift and clocked out.

Officer Law clocked in at USCP Headquarters at 7:29 a.m. and began working the 7:00 a.m. C-2 shift at the north door of the CVC at 7:44 a.m. Because the north door of the CVC does not open until 8:15 a.m., Officer Law

was on patrol from the time he arrived until 8:15 a.m.[2] Officer Law then worked the holdover shift until 3:00 p.m. His supervisor Sergeant Floyd did not discipline him for arriving late to his shift, and Officer Law was paid for the entire duration of the shift. At 6:12 p.m., Officer Law faxed a completed CP-1301 form to the USCP to obtain the required supervisory signatures.

## B. USCP Investigation and Issuance of the Command Discipline Warning

On June 30, 2014, the USCP assigned Captain Andrew Bolinger to investigate whether Officer Konczos should be disciplined for the events on June 26, 2014. As part of the investigation, Captain Bolinger reviewed two emails sent by Lieutenant McBride on June 26, 2014. The first email at 7:35 a.m. to Deputy Chief Matthew Verderosa indicated that Officer Konczos left without completing a CP-1301 form. The email also indicated that Officer Law had texted Officer Konczos regarding filling out a CP-1301 form and that Sergeant McElroy expressed a desire to address Officer Konczos's alleged insubordination upon Officer Konczos's return to duty. The second email at 7:44 a.m. noted that Chief Dine had asked Deputy Chief Verderosa to investigate the matter. It further stated that Officer Law had informed Sergeant Floyd he would be at the USCP as soon as possible to cover Officer Konczos's emergency holdover shift. On July 3, 2014, both Officer Konczos and Sergeant McElroy gave sworn statements about the events on June 26, 2014. In his sworn statement, Officer Konczos explained that Officer

---

[2] The USCP characterizes the gap between when Officer Konczos clocked out and when Officer Law reported to work as an hour. The record, however, shows that Officer Law clocked in at 7:29 a.m., fourteen minutes after Officer Konczos clocked out.

Ford informed him Officer Law would work the emergency holdover in his place.

On July 21, 2014, Captain Bolinger issued Officer Konczos a Command Discipline Warning, which stated that Officer Konczos was absent without leave. The Command Discipline Report did not mention that Officer Law had worked the emergency holdover shift or otherwise address this potentially mitigating factor. When Officer Konczos questioned Captain Bolinger about this at a July 21, 2014 meeting, Captain Bolinger did not provide a response. On July 25, 2014, Deputy Chief Verderosa approved and signed the Command Discipline Warning. Deputy Chief Verdosa admitted that, although he knew Officer Law was to cover the holdover shift, he did not investigate whether Officer Law actually worked that shift.

PROCEDURAL HISTORY

On May 20, 2015, the General Counsel of the OOC filed an administrative complaint alleging that Officer Konczos engaged in protected activity when he emailed Chief Dine regarding emergency holdovers on June 26, 2014. This protected activity, the General Counsel further alleged, was the motivating factor in the USCP's decision to issue the Command Discipline Warning.

After a two-day hearing, the Hearing Officer issued an Order finding that the USCP engaged in unfair labor practices when it issued a Command Discipline Warning to Officer Konczos because the discipline was motivated by Officer Konczos's protected activity. Specifically, the Hearing Officer found that the USCP violated §§ 220(a)(1) and (c)(2) of the Congressional Accountability Act and 5 U.S.C. §§ 7102, 7106, 7111–7117, 7119–7122, and 7131. Moreover, the Hearing Officer rejected the USCP's position that Officer Konczos had been absent without leave, given that Officer Law had covered the unscheduled shift. Because that was the only identified reason for disciplin-

ing Officer Konczos, the Hearing Officer concluded that Officer Konczos's protected activity—the email criticizing the USCP's emergency holdover practice—was a motivating factor in Officer Konczos's discipline. The Hearing Officer then ordered the USCP to expunge any reference of the discipline issued to Officer Konczos. He also directed the USCP to post a notice to employees indicating that the USCP had violated the CAA.

The OOC Board affirmed the Hearing Officer's decision on July 5, 2016. The USCP appealed that decision on September 27, 2016. We have jurisdiction pursuant to 2 U.S.C. § 1407(a)(1)(A) (2012).

DISCUSSION

Under 2 U.S.C. § 1407(d), we may set aside a final decision of the Board of the OOC only if it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law; (2) not made consistent with required procedures; or (3) unsupported by substantial evidence." 2 U.S.C. § 1407(d). The Supreme Court has held that the substantial evidence standard requires affirmance of a final agency decision if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).

In cases alleging discrimination based on protected union activity in violation of 5 U.S.C. § 7116(a), the OOC Board applies the framework set forth in *Letterkenny Army Depot*. 35 F.L,R.A. 13 (1990). Section 7116(a) states that it is unfair labor practice for an agency, among other things, "(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter . . . [and] (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given

any information or testimony under this chapter." 5 U.S.C. § 7116(a)(1), (a)(4). Under the *Letterkenny* framework, in order to establish a prima facie case of discrimination, the OOC must show that: "(1) the employee against whom the alleged discriminatory action was taken was engaged in protected activity; and (2) such activity was a motivating factor in the agency's treatment of the employee." *Id.* at 118. If the OOC is able to make a prima facie case of discrimination, the burden shifts to the USCP to show, by a preponderance of the evidence, that "(1) there was a legitimate justification for its action; and (2) the same action would have been taken even in the absence of protected activity." *Id.*

Although we have not yet had an occasion to consider the *Letterkenny* framework, we note that two other circuit courts have applied it for Federal Labor Relation Authority (FLRA) cases. *See Pension Benefit Guar. Corp. v. FLRA*, 967 F.2d 658, 666–67 (D.C. Cir. 1992) (applying the *Letterkenny* framework to determine whether the Pension Benefit Guaranty Corporation's decision to terminate an employee constituted an unfair labor practice under 5 U.S.C. § 7116(a) and remanding for the FLRA to conduct a further disparate treatment analysis); *Midder v. FLRA*, 121 F.3d 705, *3 (5th Cir. 1997) (unpublished) (applying the *Letterkenny* framework to conclude that the Bureau of Engraving and Printing Western Currency Facility did not commit unfair labor practice under 5 U.S.C. §§ 7101–7135 when it terminated an employee for engaging in and later lying about inappropriate workplace activities). Neither party suggests a different framework should apply here, and after considering the matter, we conclude that the OOC Board properly considered this case under the *Letterkenny* framework. If the USCP's justification for its discipline is found to be pretextual, then it is unnecessary to determine whether it would have taken the action absent the protected activity because such actions, by definition,

would not have been taken for nondiscriminatory reasons. *Letterkenny*, F.L.R.A. at 120; *see Golden State Foods Corp.*, 340 NLRB 382, 385 (2003).

### A. Prima Facie Case of Discrimination

As an initial matter, the parties do not dispute that Officer Konczos engaged in protected activity when he raised the USCP's practice of emergency holdover shifts with Chief Dine during regularly scheduled labor-management meetings and when he reiterated the substance of those conversations in his June 26, 2014 email to Chief Dine. The USCP contends, however, that the portion of Officer Konczos's email protesting his own personal holdover on June 26, 2014 does not constitute a protected activity.

We find that substantial evidence supports the Board's affirmance of the Hearing Officer's conclusion that Officer Konczos's email in its entirety is a protected activity. This is particularly true when the email is considered in the context of multiple instances before the June 26, 2014 incident in which Officer Konczos raised the issue of emergency holdover shifts to Chief Dine. Additionally, on June 27, 2014, in a conversation with Assistant Chief Malloy, Officer Konczos expressed his disappointment that—despite previous assurances from Chief Dine and Chief Malloy that the USCP would be flexible in working with officers—the USCP was not, in fact, flexible with officers held over for shifts on short notice. Officer Konczos's reference to his June 26, 2014 emergency holdover shift can thus be reasonably viewed as an example of the disruptive nature of the USCP's staffing policies and his disappointment in the lack of a resolution.

Accepting that Officer Konczos's June 26, 2014 email reasonably can be viewed as a protected activity, the next question is whether such activity was a motivating factor in the USCP's decision to issue him a Command Disci-

pline Warning. We find that substantial evidence supports the Board's affirmance of the Hearing Officer's conclusion that Officer Konczos's protected activity motivated the USCP's decision to issue a Command Discipline Warning.

The USCP only identified one reason for disciplining Officer Konczos: that he was absent without leave. But, substantial evidence in the record supports the conclusion that Officer Konczos was not absent without leave. While we respect the USCP's right to enforce its employment policies and understand that adequate staffing is crucial to the USCP's mission of protecting Congress, the USCP has not presented a policy or standard operating procedure under which what transpired on the morning of June 26, 2014 would result in declaring Officer Konczos absent without leave.[3]

In its briefs, the USCP sets forth three primary arguments why Officer Konczos was absent without leave: he clocked out at 7:15 a.m. (1) without obtaining a supervisor's consent to leave, (2) without waiting for Officer Law to arrive before he departed, and (3) without filling out a CP-1301 form. The USCP's employment policies, however, do not clearly require Officer Konczos to do any of the above in the context of finding a replacement for an emergency holdover.

First, under the USCP Rules of Conduct Directive 2053.013, Rule B3, "[e]mployees who fail to appear for duty at the date, time, and place without consent of a supervisor are Absent without Leave." J.A. 777. Sergeant McElroy informed Officer Konczos over the phone that he could find a qualified substitute. Officer Konczos

---

[3] Officer Konczos has only been formally charged with being absent without leave, not some other form of insubordination.

clocked out only after he learned that Officer Law had agreed to work as his substitute. Further, Sergeant Floyd, the supervisor who requested the emergency holdover shift, knew that Officer Law was coming in to work the C-2 shift and expressed no objections. Accordingly, there was supervisory knowledge and consent for Officer Law to work the emergency holdover shift in Officer Konczos's place.

Moreover, the USCP did not present any policies requiring Officer Konczos to leave his regularly scheduled C-1 post, report to the C-2 post, and wait for Officer Law to arrive.[4] Rather, Officer Konczos left at the end of his shift, per usual, knowing that a qualified substitute had been found to work the emergency holdover shift.[5]

---

[4] The USCP asserts that its officials expected Officer Konczos to work the C-2 shift until Officer Law arrived, at which time the officers would complete a CP-1301 form. It did not, however, present any policies demonstrating that this course of action is required and that an officer who fails to wait for his replacement in emergency holdover situations is considered absent without leave.

[5] At oral argument in particular, the USCP focused on the issue of consent. The USCP argued that Officer Konczos did not have supervisory consent to leave his post. Aside from reiterating the language in Rule B3, however, the USCP did not present any policies at oral argument directly addressing emergency holdover situations. Thus, from the record before us, Officer Konczos was not required by policy to report to the C-2 shift to wait for Officer Law. Officer Konczos knew that he had a substitute working the C-2 shift in his place and left his C-1 post when he was relieved, as was routine. Hypothetically, if the USCP had a policy or standard operating procedure requiring an officer to report to the next shift and wait for his replacement to arrive to ensure no per-

Further, there is no official USCP policy regarding CP-1301 forms when officers are notified they have to work an unscheduled shift the very next shift.  Rather, 1301 applies when an officer has more than 24 hours prior to the beginning of the additional, scheduled tour of duty to obtain a qualified substitute.  J.A. 768–80 (Standard Operating Procedure COP-USB-003, "Additional Duty Substitute Request" states:  "The requesting employee is permitted to find only one (1) substitute employee up to 24 hours prior to the beginning of the scheduled tour of duty.").  The USCP's 1301 policy is thus, by its terms, inapplicable to this case.

Second, the USCP was fully aware of Officer Konczos's protected activity when it chose to discipline him.  This supports the Board's affirmance of the Hearing Officer's finding that the USCP's decision to discipline Officer Konczos was motivated by the protected activity.  The USCP contends that Officer Konczos's protected activity could not be a motivating factor in issuing him the Command Discipline Warning because Captain Bolinger was not even aware of the protected activity when he instituted a disciplinary investigation.  However, Captain Bolinger admitted to reviewing Officer Konczos's statement issued as part of the investigation.  This statement reads:  "I emailed Chief Dine and AC Malloy about the ongoing issues with unscheduled holdovers, told him he didn't care about his officers, and how I expected to be suspended (this email was sent as Chairman of the USCP-FOP Labor Committee)."  Captain Bolinger thus was at least aware or should have been aware of the protected activity when deciding whether or not to discipline Officer Konczos.

---

sonnel gap in emergency holdover situations, this case may have come out differently.  But these facts are not before us.

Third, the USCP's failure to investigate whether a qualified substitute worked in Officer Konczos's place lends credence to the Board's finding that Officer Konczos's protected activity motivated the USCP's subsequent discipline. As the USCP does not have formal policies regarding substitutions for emergency holdover shifts, an investigation into whether another officer worked in Officer Konczos's place is an integral inquiry into whether Officer Konczos was truly absent without leave. Here, the Hearing Officer found that, from the information forwarded to him as part of the investigation, Captain Bolinger knew or should have known that (1) Sergeant McElroy informed Officer Konczos he was authorized to find a qualified substitute; and (2) Officer Law notified Sergeant Floyd and Officer Konczos he would cover for Officer Konczos. Despite being provided this evidence, Captain Bolinger testified that he never initiated an investigation into whether Officer Law worked the C-2 shift for Officer Konczos. As the Hearing Officer reasonably found and the Board affirmed, a failure to conduct such an inquiry supports a finding that the investigation was likely biased against Officer Konczos.

Consequently, substantial evidence supports the Board's finding that the OOC met its burden in establishing a prima facie case of discrimination under the first two *Letterkenny* prongs.

## B. Justification for Discipline

Having found that substantial evidence in the record supports the Board's finding of a prima facie case of discrimination, the inquiry next shifts to whether the USCP had a legitimate justification for its action and whether the same action would have been taken in the absence of the protected activity. *Letterkenny*, 35 F.L.R.A. at 118. We conclude that substantial evidence supports the Board's affirmance of the Hearing Officer's finding of pretext. That is, substantial evidence supports the con-

clusion that the Command Discipline Warning would not have issued absent the protected activity.

In arguing that it had a legitimate justification to discipline Officer Konczos, the USCP pointed out there was no officer working for Officer Konczos from 7:15 a.m. to 8:15 a.m. when Officer Law reported for duty; Officer Konczos failed to execute a CP-1301 form before he left; no specific supervisor approved Officer Konczos to leave; and the USCP supervisors expected that Officer Konczos would stay until Officer Law showed up. These arguments, however, are unpersuasive. First, as we noted earlier, the policies surrounding a CP-1301 form are not applicable to emergency holdover shifts when an individual is drafted fewer than 24 hours before the shift is scheduled. Second, regardless of whether the gap between when Officer Konczos clocked out and when Office Law began working the C-2 shift was an hour or 14 minutes, the USCP did not present any policies showing that Officer Konczos was required to report to the C-2 shift and wait for his replacement. Third, Officer Konczos clocked out only after learning that a qualified substitute would work in his place. This qualified substitute was approved by Sergeant Floyd, the supervising officer of the C-2 shift. And because Sergeant McElroy gave permission for Officer Konczos to find a qualified substitute to work in his stead, both Sergeants implicitly gave Officer Konczos permission to leave once his regularly scheduled shift was over and a substitute had been found. The USCP has not presented any policies or standard operating procedures requiring more explicit consent in the emergency holdover situation.

Moreover, as explained above, the USCP's failure to investigate whether a qualified substitute worked the C-2 shift suggests that its decision to discipline Officer Konczos was pretextual. The USCP contends that it was not obligated to investigate whether a substitute worked for Officer Konczos because there was still a period of 14

minutes (or an hour) during which neither Officer Konczos nor Officer Law was working. Because Officer Konczos had only transferred his emergency holdover shift through informal channels, he was still, in the USCP's view, responsible for the shift until Officer Law arrived. Again, the USCP did not present any policies requiring Officer Konczos to report to the location of the emergency holdover shift and wait for his replacement.

Further, the comparator cases that the USCP cites are inapposite because those cases address instances in which there was an issue with the CP-1301 paperwork *and* the substitute officer failed to work the additional shift. The closest comparator case that the USCP presents is one in which Officer 1 was assigned an additional shift; Officer 1 transferred his duties to Officer 2 but did not fill out a CP-1301 form; and Officer 2 failed to show up for the additional duty shift. In that instance, Officer 1 was deemed absent without leave. Unlike those cases, where it was uncertain from the record whether the officer assigned the additional shift actually obtained a qualified substitute, it is clear that Officer Konczos obtained a qualified substitute because Officer Law actually worked the emergency holdover shift. In fact, Officer Law clocked in only 14 minutes after Officer Konczos clocked out. And at no time did Sergeant Floyd complain to the USCP about a shortage of personnel.

Accordingly, in light of the investigation's failure to inquire into whether a substitute worked in place of Office Konczos, and because the USCP did not provide comparator cases in which a qualified substitute worked the emergency holdover shift, the Board's finding of pretext is supported by substantial evidence.

## CONCLUSION

Substantial evidence supports the Board's affirmance of the Hearing Officer's findings that the USCP engaged in unfair labor practices by issuing Officer Konczos a

Command Discipline Warning. We therefore affirm the Board's decision.

**AFFIRMED**